UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELIZABETH LITTLE, CATHY ARMSTRONG, CLAIR AWAD, KELLY BRANCH, SUZANNE FITZGERALD, MARI GUNN, SARAH HERANDEZ, STACY VAIL, and CHRISTINA VANVIET, on behalf of themselves and all others similarly situated, | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> DEMAND FOR JURY TRIAL |
| Plaintiffs, | |
| v. | |
| UNILEVER UNITED STATES, INC., | |
| Defendant | |

Plaintiffs Elizabeth Little, Cathy Armstrong, Clair Awad, Kelly Branch, Suzanne Fitzgerald, Mari Gunn, Sarah Hernandez, Stacy Vail, and Christina VanVliet ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated, against Unilever United States, Inc. ("Unilever" or "Defendant").  Plaintiffs make the following allegations based upon (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

**INTRODUCTION**

1.    This class action arises out of Unilever's manufacture, marketing, labeling, distribution, and sale of dry shampoo products (the "Unilever Dry Shampoo Products" or the "Products"),[1] under the Unilever brands "Suave," "TIGI," "Tresemme," "Dove," "Nexxus," and

---

[1]     The Unilever Dry Shampoo Products include, but are not limited to the following:  1) <u>Suave</u>: Hair Refresher Matte Dry Shampoo, Refresh and Revive Dry Shampoo); 2) <u>TIGI</u>: Bed Head Oh Bee Hive Dry Shampoo, Bed Head Dirty Secret, Rockaholic Dirty Secret Dry Shampoo, Rock Dry Shampoo, Catwalk Transforming Dry Shampoo, Revitalizing Dry Shampoo); 3) <u>Tresemme</u>: Fresh Clean Dry Shampoo, Brunette Clean Dry Shampoo, Volume Dry Shampoo, Between Washes Fresh & Clean Dry Shampoo, Between Washes Fresh & Clean Dry Shampoo; 4) <u>Dove</u>: Volume and Fullness Dry Shampoo, Unscented Dry Shampoo, Ultra Clean Dry Shampoo, Rose Bloom Dry Shampoo, Orange Blossom Dry Shampoo, Invisible Dry Shampoo, Fresh & Floral Dry Shampoo, Fresh Coconut Dry Shampoo, Foam Dry Shampoo, Detox and Purify Dry Shampoo, Care Between Washes Go Active Dry Shampoo Wipes, Care Between Washes Go Active Dry Shampoo, Care Between Washes Clarifying Dry Shampoo, Care Between Washes

"Living Proof" without disclosing to or warning consumers that the Products contain, and/or have a material risk of containing, high levels of benzene, a known human carcinogen.

2.     As outlined below, pharmaceutical testing laboratory Valisure, LLC ("Valisure") recently tested for the carcinogen benzene in a number of Unilever Dry Shampoo Products. Valisure's testing found that the levels of benzene in Unilever Dry Shampoo Products significantly exceeded the guidelines established by the FDA for "drug product[s] with a significant therapeutic advance," of 2 parts per million ("ppm").[2] Indeed, Valisure found that almost half of the Unilever Dry Shampoo Products it tested contained benzene that exceeded (and often far exceeded) the 2ppm limit, including benzene levels that tested as high as *31 times* the 2ppm limit. Given that the Unilever Dry Shampoo Products are consumer products – *not* drugs – these results are even more concerning.  Because dry shampoo products contain no active pharmaceutical ingredient for therapeutic purpose, the presence of benzene at these levels is unacceptable.[3]

3.     Benzene is a known human carcinogen.[4]  Benzene is proven to cause cancer in humans, including blood cancers such as leukemia.[5] Unilever itself has acknowledged that "Benzene is classified as a human carcinogen" and that exposure can "result in cancers including leukemia and blood cancer of the bone marrow and blood disorders which can be life

---

Brunette Dry Shampoo; 5) <u>Nexxus</u>: Nexxus Dry Shampoo Refreshing Mist for Volume; 6) <u>Living Proof</u>: Perfect Hair Day Dry Shampoo, Perfect Hair Day Advanced Clean Dry Shampoo.

[2]     FDA, *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs* (June 9, 2022); https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last visited July 20, 2022).

[3]     *Id.* [4]     National Cancer Institute, *Cancer-Causing Substances, Benzene*, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last visited July 20, 2022).

[4]     National Cancer Institute, *Cancer-Causing Substances, Benzene*, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last visited July 20, 2022).

[5]     *Id.*

threatening."[6]  In addition to cancer, direct exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation.[7]  There effectively is no safe exposure limit for benzene.

4.      Given Unilever's purported commitment to product safety, Unilever knew or should have known of the dangerous and carcinogenic effects of benzene and should have known that it was producing products that contained, or had a material risk of containing, benzene. Indeed, Unilever touts and promotes its "strict quality controls" to "limit the presence of benzene" in its products.  Nevertheless, Unilever has produced, marketed, labeled, distributed, and sold millions of Dry Shampoo Products that contained, or had a material risk of containing, benzene.

5.      Plaintiffs are purchasers and users of the Unilever Dry Shampoo Products. Plaintiffs purchased the Unilever Dry Shampoo Products for use in accordance with the directions provided on their packaging.  Plaintiffs did so because they believed the Unilever Dry Shampoo Products had been manufactured using acceptable standards and practices and that they were safe. However, the Unilever Dry Shampoo Products are toxic, dangerous, unmerchantable products that are unfit for their intended purpose and use.  Plaintiffs and the Class would not have purchased and used the Unilever Dry Shampoo Products, or would have paid less for the Unilever Dry Shampoo Products, had they known of the presence of benzene rendering them unsafe (or known of the material risk that the Products contained benzene) and have, therefore, not received the benefit of their bargain.

6.      Plaintiffs bring this action on behalf of themselves and the Classes (defined below) to recover damages and equitable relief for: (i) breach of express warranty; (ii) breach of implied

---

[6]      https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-nationwide-recall-of-suave-24hour/

[7]      Centers for Disease Control and Prevention, *Facts About Benzene* (2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited July 20, 2022).

warranty;  (iii) fraudulent  misrepresentation;  (iv)  fraud  by  omission;  (v)  negligent misrepresentation; (vi) unjust enrichment; and (vii) violation of state consumer protection statutes.

## PARTIES

7.     Plaintiff Elizabeth Little ("Plaintiff Little") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of Connecticut. Between 2019 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Suave and Dove from stores in and around Thomaston, CT.

8.     Cathy Armstrong ("Plaintiff Armstrong") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of California. Between 2018 and 2022 Plaintiff purchased Unilever Dry Shampoo Products including Dove from CVS stores in and around San Diego, CA.

9.     Plaintiff Clair Awad ("Plaintiff Awad") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of New York. Between 2017 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Dove from stores in and around North Bellmore, NY.

10.     Plaintiff Kelly Branch ("Plaintiff Branch") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of Texas. Between 2020 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Suave and Dove from Dollar General and Walmart stores in and around Bryan, TX.

11.     Plaintiff Suzanne Fitzgerald ("Plaintiff Fitzgerald") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of Texas. Between 2018 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Suave, Tresemme, Dove, and Nexus from Walmart, Target, and HEB stores in and around Corpus Christie, TX.

12.     Plaintiff Mari Gunn ("Plaintiff Gunn") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of Illinois. Between 2014 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Suave, Dove, and Nexxus from Ulta, Sallies, Target, Walmart, Walgreens stores in and around Chicago, IL.

13.     Plaintiff Sarah Hernandez ("Plaintiff Hernandez") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of California. Between May and July of 2022, Plaintiff purchased Unilever Dry Shampoo Products including Living Proof directly from the Living Proof website.

14.     Plaintiff Stacy Vail ("Plaintiff Vail") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of Texas. Between 2019 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Suave, Tresemme, and Dove from Walmart, Target, Amazon and HEB stores in and around Kyle, Texas.

15.     Plaintiff Christina VanVliet ("Plaintiff VanVliet") is a natural person and is, and at all times relevant hereto has been, a citizen and resident of the State of New York. Between 2019 and 2022, Plaintiff purchased Unilever Dry Shampoo Products including Dove and Tresemme from Target and Walmart stores in and around Holmes, NY.

16.     Due to Unilever's false, misleading, and deceptive representations and omissions regarding the Unilever Dry Shampoo Products containing benzene, Plaintiffs purchased and/or paid more for the Unilever Dry Shampoo Products than they would have had they known the truth about the Unilever Dry Shampoo Products.  The Products Plaintiffs received were worthless because they contain or may contain the known carcinogen benzene.  Alternatively, Plaintiffs paid a premium that they would have never paid had they known the Unilever Dry Shampoo Products

contained or risked containing benzene.  Accordingly, Plaintiffs were injured in fact and lost money as a result of Unilever's improper conduct.

17.     Plaintiffs would be willing to purchase or consider purchasing the Unilever Dry Shampoo Products in the future if they could be certain that the Unilever Dry Shampoo Products no longer contained (or had a material risk of containing) benzene.

18.     Defendant Unilever United States, Inc. ("Unilever") is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom and selling notable brand names such as Suave, TIGI, Tresemme, Dove, Nexxus, and Living Proof.

19.     Though Unilever is a Delaware corporation with its headquarters listed as Englewood Cliffs, New Jersey, on information and belief, Unilever designed, developed, and/or manufactured the Unilever Dry Shampoo Products primarily in Connecticut, where Unilever has maintained a substantial multi-decade presence, employing numerous individuals conducting the research and development of, and manufacturing and compliance operations for, its hair care products and particularly Unilever Dry Shampoo Products, including product engineers and scientists, regulatory and compliance specialists, and product designers.  As recently as 2020, Unilever was reported to have approximately 400 employees in its Trumbull, CT campus, in addition to other Connecticut-based employees.

20.     On information and belief, Suave, TIGI, Tresemme, Dove, Nexxus, and Living Proof are cosmetic brands that are wholly owned by Unilever, which sells and markets its Unilever Dry Shampoo Products under these names.

21.     Unilever manufactures, markets, labels, distributes, and sells the Unilever Dry Shampoo Products throughout the United States through these brand names.  Unilever created

and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling of the Unilever Dry Shampoo Products.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2)(A), because this is a class action with aggregate claims exceeding $5,000,000, exclusive of interest and costs, and Plaintiffs and most members of the proposed Class are citizens of states different from Unilever.

23.     The Court has personal jurisdiction over Unilever because it transacts business in the United States, including in this District, developed Dry Shampoo Products in this District, marketed the Unilever Dry Shampoo Products in this District, and has availed itself of the consumer marketplace in this District.

24.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Unilever transacts significant business in this District and because a substantial part of the conduct giving rise to this complaint took place within this District. Critical research and development of Unilever dry shampoo products, along with regulatory affairs related to such products, appears to have occurred in Connecticut, particularly in the Unilever facility in Trumbull, and to a lesser extent, in New Haven. In addition, one of the plaintiffs is a citizen and resident of Connecticut.

## SUBSTANTIVE ALLEGATIONS

**A.  Unilever Promotes the Unilever Dry Shampoo Products as Safe and Suitable for Individual Use but Fails to Disclose the Presence or Risk of Carcinogenic Benzene in the Unilever Dry Shampoo Products**

25.     Personal care products are a multi-billion-dollar industry in the United States.  In 2019 alone, the retail value of personal care products was estimated to be greater than $100 billion in North America.

26.     Consumers have become increasingly concerned about the effects of synthetic and chemical ingredients in products that they and their family members put on and/or into their bodies. Indeed, consumers are specifically demanding the removal of toxic contaminants, specifically such as benzene, from the personal care products that they use in daily care routines, such as sunscreens, deodorants and antiperspirants, and other over-the-counter personal care products since consumers do not want chemical-laden formulations in these personal care products that are directly inhaled and/or applied to and absorbed by large areas of the skin.[8]

27.     Unilever knows this and seeks to capitalize on consumers' product safety concerns.

28.     Specifically, on its website, Unilever declares: "Product safety is our top priority. Our home and personal care products are used every day by millions of people around the world. People trust us to provide them with products that are safe for them, their families and the environment."[9]

29.     Unilever also states on its website: "At a minimum we ensure our products comply with applicable laws. In several areas we set our standards higher than those required by law. When this happens [,] we also expect our suppliers and partners to meet these standards. Similarly, when we take on a new brand or a new company we work to ensure they meet our standards as soon as possible."[10]

30.     Unilever often combines representations about safety and environmentalism. Under the banner "Safe and sustainable by design: How we build safety and environmental sustainability into every product innovation," Unilever declares on its website (emphasis added):

---

[8]     *See, e.g.*, https://www.law360.com/articles/1396438/neutrogena-sued-over-claims-sunscreen-contains-benzene; https://www.law360.com/articles/1489231/procter-gamble-sued-over-carcinogen-in-deodorant-sprays.

[9]     https://www.unilever.com/brands/whats-in-our-products/how-do-we-choose-our-ingredients/

[10]     https://www.unilever.com/brands/whats-in-our-products/how-do-we-choose-our-ingredients/

"We ensure that our products are safe for consumers and workers and have a positive impact on the environment.

Our Safety and Environmental Assurance Centre's (SEAC) industry-leading safety and environmental sustainability science has been developed and applied in partnership with external experts over many years. We use this science across Unilever, working with our colleagues to **ensure that our products and processes are safe and sustainable by design** and that our purpose-led brands can be confident in the statements they make about product and ingredient safety, health, environmental sustainability and the planet. SEAC scientists work closely with other scientists across Unilever at every stage of a product's life, from discovering and designing new concepts through to fully embedding new technologies in our product innovations and understanding product use and disposal by consumers across the world. By being involved at the very beginning, SEAC scientists can provide essential safety and environmental sustainability guidance throughout the innovation process.

Those partnerships across Unilever allow us to apply t**he best creative, leading-edge science and to truly design safety and sustainability into our products**. This means **new Unilever products and processes are <u>always</u> designed to ensure that they are safe for our consumers to use,** for our workers to make, and for the environment. Such an approach also helps us to identify how to minimise the environmental impacts of our products and manufacturing processes, notably regarding energy, water and waste across their lifecycle."[11]

31.     Unilever underscores that, in fact, it has a team of scientists, known as SEAC, dedicated to safety, health, and environmentalism: "SEAC is a team of industry-leading safety and environmental sustainability scientists. They use the latest techniques, deep scientific expertise and an evidence-based approach to ensure that **our products are safe for consumers** and workers and better for the environment." (Emphasis added.)

32.     Unilever also touts the health and safety of its products vis-à-vis its individual brands.

33.     Unilever brand Suave claims that its hair products are made of "select natural ingredients" – "so you can trust we've got the good stuff."[12]

---

[11]     https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/

[12]     https://www.suave.com/us/en/about.html

34.     Unilever brand Tresemme, showing full awareness of the importance of benzene-free products, states: "TRESemmé does not use benzene as an ingredient in our products. Any trace amount of benzene detected in the final products usually occurs due to its natural presence in certain raw materials, and we have strict quality controls in place that limit the presence of benzene and ensure compliance with the highest global safety standards."[13]

35.     Unilever brand Dove touts its robust commitment to consumer health: "We care about our customers and the environment, so our products are as safe as they are caring. We want to give our customers the best experience using our products, so our ingredients always comply with regulations and meet our safety and environmental standards (which often go beyond regulatory requirements)."[14]

36.     Unilever brand Living Proof utilizes a science motif for its "PhD" (which doubles as "perfect hair day") products, emphasizing the rigor of its product testing: "Every single product is rigorously developed and tested at our in-house laboratories in Boston—not too far from our original home at MIT University."[15]

37.     Above and beyond representations Unilever has made through its brands, Unilever has also made specific representations that its products are safe from benzene.

38.     In December of 2021, following the discovery of benzene in certain aerosol spray sunscreens made by various companies, as well as further investigations into the use of aerosol as presenting a specific risk, Unilever responded to an inquiry by Forbes magazine: "Unilever said in

---

[13]        https://www.tresemme.com/us/en/contact-us/faq.html

[14]        https://www.dove.com/us/en/secure/contactus/faq.html

[15]        https://www.livingproof.com/our-story.html

an emailed statement it conducted a 'robust investigation' of its antiperspirants and deodorants and is confident in their safety."[16]

39.    In March of 2022, Unilever announced the decision to recall several Suave deodorant products due to the presence of benzene, which the company acknowledged is a "human carcinogen" that "can result in cancers including Leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening."[17]

40.    Unilever attributed the presence of benzene to the fact that (like Unilever Dry Shampoo Products) these were aerosol spray products, and stated that Benzene is not an ingredient: "While benzene is not an ingredient in any of the recalled products, the review showed that unexpected levels of benzene came from the propellant that sprays the product out of the can."[18]

41.    Unilever claims that its products are safe from benzene, stating on its website: "we have strict quality controls in place that limit the presence of benzene in our products so that any traces found fall within safe levels."[19]

42.    Despite the highly dangerous levels of benzene found in some of its competitors' aerosol products, as well as Unilever's need to recall certain of its own spray deodorant products due to the presence of benzene, Unilever projects that its Products are healthy and safe.  In fact, in Unilever's labeling and product packaging, and in its advertising – including on its website and

---

[16]    https://www.bloomberg.com/news/articles/2021-12-29/toxins-in-household-products-leave-fda-chasing-a-vapor-trail

[17]    https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-nationwide-recall-of-suave-24hour/

[18]    *Id*.
[19]    https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/controlling-impurities/

online – Unilever promotes and indeed instructs that the Dry Shampoo Products are not just for occasional use but also for *daily* (and regular, repeated) use.[20]

43.     Notably, benzene is not a listed ingredient on the labels, product packaging, or on marketing or promotional materials or on-line advertising for any of the Unilever Dry Shampoo Products manufactured, distributed, or sold by Unilever.

44.     In addition, Unilever's Dry Shampoo Products' packaging and labels (and its marketing and promotional materials) do not warn that Unilever Dry Shampoo Products contain, or have a material risk of containing, benzene, a carcinogenic chemical known to cause cancer in humans.

45.     While Unilever does not warn about the presence of benzene, it does warn about other hazards of using the product, stating boldly and prominently such warnings as: "Flammable until Fully Dry."  "Do Not Use Near Heat, Flame or While Smoking Can Cause Serious Injury or Death."  "Danger" Extremely Flammable."

46.     Plaintiffs and the Class are reasonable consumers who do not have the scientific knowledge or wherewithal to independently determine that the Unilever Dry Shampoo Products contained, or were at material risk of containing, benzene or to understand the true nature of the Products' ingredients.  Consumers must and do rely on Unilever to provide them with accurate information on the ingredients in the Unilever Dry Shampoo Products, particularly given the products contain or were at material risk of containing, benzene — facts that are material to consumers given its propensity to cause adverse health effects.

---

[20]         https://www.suave.com/us/en/products/hair-refresher-dry-shampoo.html;
https://www.livingproof.com/perfect-hair-day/advanced-clean-dry-shampoo/R1024.html

47.     The Unilever Dry Shampoo Products' packaging does not identify benzene. Indeed, benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Unilever Dry Shampoo Products.  This leads reasonable consumers to believe the Unilever Dry Shampoo Products do not contain benzene.

48.     However, despite the fact that the Unilever Dry Shampoo Products' labeling and ingredient listing do not list benzene, the Unilever Dry Shampoo Products contain, or have a material risk of containing, benzene.

**B.  Benzene Is a Known Human Carcinogen with No Safe Exposure Level**

49.     Research has demonstrated that there is no safe level of benzene exposure.[21]

50.     Benzene is a colorless, flammable liquid that can occur from natural processes, such as forest fires or volcanoes, or from artificial human manufacturing activities.[22]

51.     Benzene can be absorbed through the skin during contact with a source of benzene.[23]

52.     Benzene is a known human carcinogen, meaning that it is known to cause cancer. Studies have shown that rates of leukemia are higher in humans exposed to high levels of benzene.[24]  Studies have also suggested links to the following cancers: (1) childhood leukemia; (2) acute lymphocytic leukemia; (3) chronic lymphocytic leukemia; and (4) other blood-related

---

[21]     Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 ANNUAL REVIEW OF PUBLIC HEALTH 133 (Apr. 21, 2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.  *See also* Exposure to Benzene: A Major Public Health Concern, WORLD HEALTH ORG. (2010), https://www.who.int/publications/i/item/WHO-CED-PHE-EPE-19.4.2.

[22]     American Cancer Society, *Benzene and Cancer Risk*, https://www.cancer.org/cancer/cancer-causes/benzene.html (last visited July 20, 2022).

[23]     *Id.*

[24]     *Id.*

cancers such as multiple myeloma and non-Hodgkin lymphoma in adults (collectively, "Benzene-caused Cancer(s)").[25]

53.     Lab studies on labs rats and mice have shown that when benzene is inhaled or swallowed it causes different types of tumors to develop.[26]  These results support the finding of an excess risk of leukemia in humans.[27]

54.     The United States Department of Health and Human Services ("DHHS") has determined that benzene causes cancer in humans.[28]  Long-term exposure to high levels of benzene in the air can cause leukemia, cancer of the blood-forming organs.[29]

55.     The National Toxicology Program (hereinafter "NTP") has regarded benzene as "*known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans."[30]

56.     Similarly, the World Health Organization ("WHO") and the International Agency for Research on Cancer ("IARC") have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[31]

57.     The National Institute for Occupational Safety and Health ("NIOSH") recommends that workers who expect to be exposed to benzene at concentrations of 0.1 ppm wear protective

---

[25]     *Id.*

[26]     *Id.*

[27]     *Id.*

[28]     Centers for Disease Control and Prevention, *Facts About Benzene* (2018), https://emergency.cdc.gov/agent/benzene/basics/facts.asp (last visited July 20, 2022).

[29]     *Id.*

[30]     Benzene, Report on Carcinogens, Fourteenth Edition, DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 3, 2016), https://ntp.niehs.nih.gov/ntp/roc/content/profiles/benzene.pdf.

[31]     Benzene, IARC MONOGRAPHS ON THE EVALUATION OF CARCINOGENIC RISKS TO HUMANS, Volume 120 (2018), https://publications.iarc.fr/_publications/media/download/6043/20a78ade14e86cf076c3981a9a094f45da6d27cc.pdf.

equipment and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[32]

58.     The FDA classifies benzene as a "Class 1 solvent."  Accordingly, FDA guidance states that benzene should not be used in the manufacture of any component of a drug product, and only if benzene use is "***unavoidable*** to produce a drug product with significant therapeutic advance," then a strict limit of 2 ppm should apply.[33]  Dry shampoo products are regulated by the FDA as cosmetics, not drugs.  Since dry shampoos contain no active pharmaceutical ingredient for a "therapeutic" purpose, any significant detection of benzene should be deemed unacceptable.[34]

59.     The Federal Food, Drug, and Cosmetics Act ("FDCA") prohibits the marketing of adulterated or misbranded cosmetics in interstate commerce and specifies that a product is adulterated if "it bears or contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the labeling thereof, or under conditions of use as are customary and usual" and is misbranded if "its labeling is false or misleading in any particular."[35]

---

[32]     NIOSH Pocket Guide to Chemical Hazards – Benzene, THE NATIONAL INSTITUTE FOR OCCUPATIONAL SAFETY AND HEALTH (NIOSH), https://www.cdc.gov/niosh/npg/npgd0049.html.

[33]     FDA, *FDA alerts drug manufacturers to the risk of benzene contamination in certain drugs* (June 9, 2022), https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (last visited July 20, 2022).

[34]     *Id.* [35]  FDA, *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated* (March 8, 2021), https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last visited July 20, 2022). *See also* 21 U.S.C. §§331(a), 361(a), 362(a).

[35]     FDA, *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated* (March 8, 2021), https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last visited July 20, 2022). *See also* 21 U.S.C. §§331(a), 361(a), 362(a).

60.     The FDA has announced recent company recalls of various products contaminated with benzene, including hand sanitizers, sunscreens, anti-fungal sprays, antiperspirants, and certain dry shampoos that are not the subject of this action.[36]

**C.  Unilever's Dry Shampoo Products Contain, or Have a Material Risk of Containing, Benzene**

61.     In January through May of 2022, Valisure tested Unilever Dry Shampoo Products. The Valisure Results (as set forth herein) show that the Unilever Dry Shampoo Products are contaminated, and have a material risk of being contaminated, with unsafe levels of benzene.

62.     Valisure tested 36 unique batches of the Unilever Dry Shampoo Products. The results show significant numbers of benzene in the Unilever Dry Shampoo Products. Almost 50% (17) of the 36 Unilever batches tested above 2ppm – the FDA's "strict" limit for *drug* products, and an additional 8 batches tested between the Limit of Quantification that Valisure set at 0.18 ppm to reflect measurable/detectable levels of benzene, and 2ppm, bringing the total amount of tested products containing benzene to almost 70% of the batches tested (25 of the 36 batches). Even more startling are the levels of benzene in the Unilever Products tested, which yielded multiple results of 5, 10, 15, 20 and, in one sample, over **31 times** the 2 ppm strict limit set by the

---

[36]     *See, e.g.*, FDA, *Scentsational Soaps & Candles, Inc. Voluntarily Expands Nationwide Recall of Scented Hand Sanitizers Due to the Presence of Methanol (Wood Alcohol), Benzene and Acetaldehyde* (May 13, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/scentsational-soaps-candles-inc-voluntarily-expands-nationwide-recall-scented-hand-sanitizers-due#recall-announcement; FDA, *Johnson & Johnson Consumer Inc. Issues Voluntary Recall of Specific NEUTROGENA® and AVEENO® Aerosol Sunscreen Products Due to the Presence of Benzene* (July 14, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol); FDA, *Bayer Issues Voluntary Recall of Specific Lotrimin® and Tinactin® Spray Products Due to the Presence of Benzene* (October 1, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/bayer-issues-voluntary-recall-specific-lotriminr-and-tinactinr-spray-products-due-presence-benzene; FDA, *P&G Issues Voluntary Recall of Specific Old Spice and Secret Aerosol Spray Antiperspirants and Old Spice Below Deck Aerosol Spray Products Due to Detection of Benzene* (Nov. 23, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice; FDA, *P&G Issues Voluntary Recall of Aerosol Dry Conditioner Spray Products and Aerosol Dry Shampoo Spray Products* (Dec. 17, 2021), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-aerosol-dry-conditioner-spray-products-and-aerosol-dry-shampoo-spray (last visited July 20, 2022).

FDA for drug products, including ten samples that tested over **10 times** the FDA's level, and fifteen Unilever samples that tested above twice the 2 ppm strict FDA limit).  Notably, Unilever Dry Shampoo Products are cosmetic products, *not* drug products, rendering these results even more egregious.

63.    The Valisure Results concerning the Unilever Dry Shampoo Products with detectable levels of benzene, above Valisure's 0.18 Limit of Quantification, are set forth in the table below:

| Brand | UPC | Lot | Description | Benzene Concentration (PPM) |
|-------|-----|-----|-------------|------------------------------|
| Tresemme | 022400004495 | 04201KK17 | Tresemme Between Washes Dry Shampoo - Fresh & Clean - 5 oz | 63.3 |
| TIGI | 615908432671 | 04301KK07 | TIGI Bed Head Dirty Secret Dry Shampoo - 6.2 oz | 59.3 |
| Suave | 079400391483 | 05141KK09 | Suave Professionals Refresh & Revive Dry Shampoo - 4.3 oz | 47.9 |
| Suave | 079400391483 | 05151KK09 | Suave Professionals Refresh & Revive Dry Shampoo - 4.3 oz | 36.3 |
| TIGI | 615908431285 | 07210KK01 | TIGI Bed Head Oh Bee Hive Volumizing Dry Shampoo - 5 oz | 18 |
| TIGI | 615908432701 | 06110KK01 | TIGI Bed Head Dirty Secret Dry Shampoo - 2.1 oz | 15.2 |
| TIGI | 615908432701 | 05051KK08 | TIGI Bed Head Dirty Secret Dry Shampoo - 2.1 oz | 14.5 |
| Dove | 079400449351 | 05201KK74 | Dove Refresh & Revive Care Between Washes Dry Shampoo - Fresh Coconut - 5 oz | 13.4 |
| TIGI | 615908419788 | 06266KK22 | TIGI Bed Head Rockaholic Dirty Secret Dry Shampoo - 6.3 oz | 12.3 |
| Dove | 079400449351 | 06101KK75 | Dove Refresh & Revive Care Between Washes Dry Shampoo - Fresh Coconut - 5 oz | 11.1 |
| Tresemme | 022400002422 | 08200KK16 | Tresemme Volume Clean Dry Shampoo - Warm Petals - 7.3 oz | 11 |
| Tresemme | 022400005683 | 06031KK07 | Tresemme Pro Pure Dry Shampoo Clean - No Visible Residue - 5 oz | 8.55 |

| TIGI | 615908419788 | 07254KK01 | TIGI Bed Head Rockaholic Dirty Secret Dry Shampoo - 6.3 oz | 6.94 |
| Dove | 079400202444 | 06171KK48 | Dove Refresh & Revive Care Between Washes Dry Shampoo - Volume & Fullness - 5 oz | 6.26 |
| TIGI | 615908432671 | 07140KK04 | TIGI Bed Head Dirty Secret Dry Shampoo - 6.2 oz | 5.4 |
| Nexxus | 605592646638 | 07300KK05 | Nexxus Dry Shampoo Refreshing Mist With Pearl Extract - 5 oz | 3.17 |
| TIGI | 615908432671 | 07140KK04 | TIGI Bed Head Dirty Secret Dry Shampoo - 6.2 oz | 2.65 |
| Nexxus | 605592646638 | 07300KK05 | Nexxus Dry Shampoo Refreshing Mist With Pearl Extract - 5 oz | 1.4 |
| Tresemme | 022400005256 | 07161KK19 | Tresemme Fresh Clean Dry Shampoo - Fresh Bouquet - 7.3 oz | 1.36 |
| Living proof. | 855685006485 | E21096F | Living proof. Perfect hair Day - Dry Shampoo - 4 oz | 0.972 |
| Nexxus | 605592646638 | 02010KK04 | Nexxus Dry Shampoo Refreshing Mist With Pearl Extract - 5 oz | 0.611 |
| Tresemme | 022400005683 | 02210KK03 | Tresemme Pro Pure Dry Shampoo Clean - With 100% Natural Tapioca Cleanser - 5 oz | 0.561 |
| Living proof. | 855685006492 | E21222R | Living proof. Perfect hair Day - Dry Shampoo - 1.8 oz | 0.512 |
| Living proof. | 855685006492 | E21223R | Living proof. Perfect hair Day - Dry Shampoo - 1.8 oz | 0.317 |
| TIGI | 615908431285 | 09091KK06 | TIGI Bed Head Oh Bee Hive Volumizing Dry Shampoo - 5 oz | 0.184 |

### D. Unilever Knowingly Sold the Unilever Dry Shampoo Products Containing, or Having a Material Risk of Containing, Benzene to Plaintiffs and the Class

64.     Benzene is not a listed ingredient on the label of any of the Unilever Dry Shampoo Products.  Yet, Unilever knew or should have known that the Unilever Dry Shampoo Products contained, or were at risk of containing, carcinogenic benzene, particularly in light of all the product testing Unilever purports to conduct.

65.     Certain other personal care products recently have been identified as contaminated with benzene, including in Petitions filed with the FDA by Valisure.

66.     For example, in May 2021, Valisure found benzene present in several brands of aerosol spray sunscreen.[37]  This prompted Johnson & Johnson in July 2021 to voluntarily recall all lots of five Neutrogena and Aveeno aerosol sunscreen product lines.  According to Johnson & Johnson, "[i]nternal testing identified low levels of benzene in some samples of the products. Consumers should stop using the affected products[.]"[38]

67.     Similarly, on November 4, 2021, Valisure announced the detection of high levels of benzene in several brands and batches of antiperspirant body sprays, which are considered drug products by the FDA, as well as in deodorant body spray products, which FDA generally regulates as cosmetics.[39]

68.     In response to these benzene results in body spray products, on November 23, 2021, Procter & Gamble Company ("P&G") issued a voluntary recall of certain of its Old Spice and Secret aerosol spray antiperspirants due to the "presence of benzene detected in some products."[40]

69.     Less than a month later, on December 17, 2021, P&G voluntarily recalled more than 30 of its aerosol spray dry shampoo and dry conditioner products ("P&G Dry Shampoo Recall"), such as Pantene, Aussie, Herbal Essences, Waterless, and Old Spice products due to the "presence of benzene detected in some products."[41]  The P&G Dry Shampoo Recall noted, among

---

[37] https://www.valisure.com/valisure-newsroom/fda-citizen-petition-5-benzene-in-sunscreens.

[38]     https://www.jnj.com/johnson-johnson-consumer-inc-issues-voluntary-recall-of-specific-neutrogena-and-aveeno-aerosol-sunscreen-products-due-to-the-presence-of-benzene

[39]     https://www.valisure.com/valisure-newsroom/fda-citizen-petition-6-benzene-in-body-spray-products.

[40]     https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-specific-old-spice-and-secret-aerosol-spray-antiperspirants-and-old-spice.

[41]     https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/pg-issues-voluntary-recall-aerosol-dry-conditioner-spray-products-and-aerosol-dry-shampoo-spray.

other things, that "[f]ollowing recent reports that indicated traces of benzene in some aerosol spray products, we began a review of our total portfolio of aerosol products."[42]

70.    P&G admitted "[w]hile benzene is not an ingredient in any of our products, our review showed that unexpected levels of benzene came from the propellant that sprays the product out of the can. We detected benzene in aerosol dry shampoo spray products and aerosol dry conditioner spray products."[43]

71.    In relation to these findings of benzene in similar aerosol products, and the concomitant recalls of those products, a reporter from Bloomberg magazine asked Unilever whether its products were safe. According to Bloomberg, "Unilever said in an emailed statement it conducted a 'robust investigation' of its antiperspirants and deodorants and **is confident in their safety**" (emphasis added).[44]

72.    Yet several months later, in March of 2022, Unilever announced the decision to recall several Suave spray deodorant products due to the presence of benzene, which the company acknowledged is a "human carcinogen" that "can result in cancers including Leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening."[45]

73.    Unilever attributed the presence of benzene to the fact that these were aerosol spray products. "While benzene is not an ingredient in any of the recalled products, the review showed

---

[42]    *Id*.

[43]    *Id*.

[44]    https://www.bloomberg.com/news/articles/2021-12-29/toxins-in-household-products-leave-fda-chasing-a-vapor-trail

[45]    https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-nationwide-recall-of-suave-24hour/

that unexpected levels of benzene came from the propellant that sprays the product out of the can."[46]

74.     Unilever claims that its products are safe from benzene, stating on its website: "we have strict quality controls in place that limit the presence of benzene in our products so that any traces found fall within safe levels."[47]

75.     Although Valisure's testing results demonstrate that aerosol spray personal care products have a particular risk of containing, benzene, Unilever has sold – and continues to sell – the Products.

76.     Despite Unilever's obligations with respect to manufacturing, marketing, processing, packing, labeling, distribution, and sale described above, Unilever failed to comply with its common law and state statutory obligations by introducing the Unilever Dry Shampoo Products, which are unsafe and not fit for their intended use and purpose, into the stream of commerce.

77.     Unilever, as the manufacturer, marketer, processor, packer, distributor, and seller of the Unilever Dry Shampoo Products had (and still has) an ongoing duty to ensure the Unilever Dry Shampoo Products did not contain dangerous levels of benzene.

78.     Had Unilever complied with its duties under state law to observe manufacturing, marketing, processing, packing, labeling, and distribution best practices, benzene would not have made its way into the Unilever Dry Shampoo Products.

---

[46]      *Id*.

[47]      https://www.unilever.com/brands/whats-in-our-products/your-ingredient-questions-answered/controlling-impurities/

79.     Further, had Unilever adopted adequate testing procedures to ensure that the products it was introducing into the stream of commerce did not contain dangerous carcinogens such as benzene, it would have discovered that its manufacturing, marketing, processing, packing, labeling, and distribution processes were deficient and would have detected benzene in its products and prevented their introduction into the stream of commerce.

80.     Unilever's failures described above allowed benzene to be present in the Unilever Dry Shampoo Products.  This means the Unilever Dry Shampoo Products are "adulterated" under the FDCA as they contain a "deleterious substance which may render [the Unilever Dry Shampoo Products] injurious to users." 21 U.S.C. §361(a).  The Products also are "misbranded" under the FDCA because the Product labels do not disclose the presence of benzene, rendering them "false" and "misleading." 21 U.S.C. §362(a).

81.     As a result of Unilever's failure to keep benzene out of the Unilever Dry Shampoo Products, millions of consumers, including Plaintiffs, have been exposed to dangerous levels of benzene, a known carcinogen, by simply following the directions found on the packaging of the Unilever Dry Shampoo Products.

82.     The Products' labeling fails to disclose that the Unilever Dry Shampoo Products contain benzene.  And the absence of this disclosure conveys that benzene is not contained in the Unilever Dry Shampoo Products, which independent third-party testing has shown to be false.

83.     The omission that the Unilever Dry Shampoo Products contain a dangerous carcinogen is a material fact for any consumer item (and for any reasonable consumer), and especially so for a product that typically is used several times per week for years.

84.     Exposure to carcinogens is even more material given that other products that offer the same benefits (i.e., other brands of dry shampoo) are benzene-free.

85.     Therefore, Unilever's false, misleading, and deceptive misrepresentations and omissions regarding the ingredients of the Unilever Dry Shampoo Products are likely to continue to deceive and mislead reasonable consumers and the public, as they have already deceived and misled Plaintiffs and Class members.

86.     Unilever's concealment and/or omission was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiffs and Class members are influenced by the ingredients listed and not listed.  Unilever knew that if it had not concealed and/or omitted that the Unilever Dry Shampoo Products contained benzene, then Plaintiffs and the Class would not have purchased the Unilever Dry Shampoo Products at all or would have paid less for the Unilever Dry Shampoo Products.

### E.  Consumers, Including Plaintiffs and the Classes, Have Been Harmed

87.     Unilever's representations and warranties (and omissions) were intended to, and did, induce Plaintiffs and those similarly situated to trust and rely on Unilever and purchase the Unilever Dry Shampoo Products.  Unilever knowingly omitted the presence of benzene in order to induce and mislead reasonable consumers to purchase the Unilever Dry Shampoo Products.

88.     Plaintiffs and other similarly situated consumers, having read and relied on such representations and warranties, were induced to believe that the Unilever Dry Shampoo Products were safe and suitable for use, and purchased them as a result.  Notably, none of the Unilever Dry Shampoo Products' packaging or marketing materials warned that the Unilever Dry Shampoo Products contained or had a material risk of containing carcinogenic benzene.

89.     Unilever falsely represented and warranted the contents, ingredients, safety, and quality of the Unilever Dry Shampoo Products because Unilever knew that Plaintiffs and similarly situated consumers would never have purchased the Unilever Dry Shampoo Products if truthful information had been provided.  At all times, Unilever had a duty to provide only accurate and

truthful representations, warranties, and information about the Unilever Dry Shampoo Products, and the aforesaid conduct breached that duty. As a result, Plaintiffs and those similarly situated were economically harmed.

90. Plaintiffs purchased the Unilever Dry Shampoo Products without knowing or having reason to know that the Unilever Dry Shampoo Products contained, or had a material risk of containing, dangerous levels of benzene. Had Plaintiffs known that the Unilever Dry Shampoo Products contained, or had a material risk of containing, dangerous levels of benzene, they would not have purchased the Unilever Dry Shampoo Products at all or would have paid less for the Unilever Dry Shampoo Products.

91. Plaintiffs and the Class members bargained for dry shampoo products that conformed with their labels and did not contain dangerous levels of carcinogens such as benzene. Plaintiffs were deprived of the benefit of the bargain when they received the Unilever Dry Shampoo Products, which contained or had a material risk of containing dangerous levels of benzene in them. Plaintiffs and the Class members are thus entitled to full or partial refunds for the amounts paid for the Unilever Dry Shampoo Products they purchased on the basis that they have been deprived of the benefit of their bargain.

**F. Plaintiffs' Allegations**

92. Plaintiffs purchased and used the Unilever Dry Shampoo Products, as described above.

93. Plaintiffs used each Product she purchased as directed by the product labels.

94. Plaintiffs would not have purchased or used any Products, or would have paid less for the Products, had they known that the Unilever Dry Shampoo Products were at risk of, or did in fact, contain benzene.

95.     Plaintiffs were deprived of the benefit of the bargain when she purchased Products without knowing the Unilever Dry Shampoo Products were at risk of containing, or did in fact contain, benzene.

## TOLLING AND ESTOPPEL

### A.     Discovery Rule Tolling

96.     Plaintiffs and the members of the Class and Subclasses had no way of knowing about Unilever's conduct with respect to the presence of carcinogenic benzene.

97.     Neither Plaintiffs nor any other members of the Class or Subclasses, through the exercise of reasonable diligence, could have discovered the conduct alleged herein.  Further, Plaintiffs and members of the Class and Subclasses did not discover (and could not have discovered) and did not know of facts that would have caused a reasonable person to suspect that Unilever was engaged in the conduct alleged herein.

98.     For these, reasons, all applicable statutes of limitation have been tolled by discovery rule with respect to claims asserted by Plaintiffs and members of the Class, and the Subclasses.

### B.   Fraudulent Concealment Tolling

99.     By failing to provide notice of the presence of carcinogenic benzene in the Unilever Dry Shampoo Products, Unilever concealed its conduct and the existence of the claims asserted herein from Plaintiffs and the members of the Class and Subclasses.

100.     Upon information and belief, Unilever intended its acts to conceal the facts and claims from Plaintiffs and members of the Classes and Subclasses.  Plaintiffs and the members of the Class and Subclasses were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Unilever's conduct.  For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or members of the Class or Subclasses should be tolled.

### C. Estoppel

101.    Unilever was under a continuous duty to disclose to Plaintiffs and the members of the Classes the risks of consuming the Unilever Dry Shampoo Products.

102.    Unilever knowingly, affirmatively, and actively concealed or recklessly disregarded the true risks of consuming the Unilever Dry Shampoo Products and led consumers to believe they were safe and suitable for consumption.

103.    Accordingly, Unilever is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ALLEGATIONS

104.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (3), and 23(c)(4).

105.    Plaintiffs seek certification of the following Class and Subclasses:

106.    Plaintiffs seek class certification on behalf of a class defined as follows (the "Class"):

**CLASS:** All persons in the United States who purchased any of the Unilever Dry Shampoo Products for personal, family or household use within the applicable statute of limitations.

107.    Plaintiffs seek certification on behalf of the following subclasses (collectively referred to as the "Subclasses") defined as follows:

**CALIFORNIA SUBCLASS:** All persons who were or are citizens of the State of California who purchased any of the Unilever Dry Shampoo Products for personal, family or household use within the applicable statute of limitations (the "California Subclass").

**CONNECTICUT SUBCLASS:** All persons who were or are citizens of the State of Connecticut who purchased any of the Unilever Dry Shampoo Products for personal, family or household use within the applicable statute of limitations (the "Connecticut Subclass").

**ILLINOIS SUBCLASS:** All persons who were or are citizens of the State of Illinois who purchased any of the Unilever Dry Shampoo Products for personal, family or household use within the applicable statute of limitations (the "Illinois Subclass").

**NEW YORK SUBCLASS:** All persons who were or are citizens of the State of New York who purchased any of the Unilever Dry Shampoo Products for personal, family or household use within the applicable statute of limitations (the "New York Subclass").

**TEXAS SUBCLASS:** All persons who were or are citizens of the State of Texas who purchased any of the Unilever Dry Shampoo Products for personal, family or household use within the applicable statute of limitations (the "Texas Subclass").

108.    Plaintiffs reserve the right to modify or refine the definitions of the Class or Subclasses based upon discovery of new information and to accommodate any of the Court's manageability concerns.

109.    **Ascertainability**.  The proposed Class and Subclasses are readily ascertainable because they are defined using objective criteria to allow class members to determine if they are part of a Class or Subclass.  Further, the Class and Subclasses can be readily identified through records maintained by Unilever.

110.    **Numerosity (Rule 23(a)(1))**.  The Classes and Subclasses are so numerous that joinder of individual members herein is impracticable.  The exact number of members of the Class and Subclasses, as herein identified and described, is not known; upon information and belief there are millions of individuals who purchased the Unilever Dry Shampoo Products.

111.    **Commonality (Rule 23(a)(2))**.  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

(a)    whether the Unilever Dry Shampoo Products contain, or had a material risk of containing, benzene;

(b)    whether Unilever knew of should have known that the Unilever Dry Shampoo Products contained, or had a material risk of containing, benzene;

(c)    whether Unilever had a duty to disclose, and wrongfully failed to disclose, that the Unilever Dry Shampoo Products contained, or had a material risk of containing, benzene;

(d)    whether Unilever misrepresented material facts and/or failed to disclose materials facts in connection with the manufacturing, packaging, labeling, marketing, distribution, and sale of the Unilever Dry Shampoo Products;

(e)    whether Unilever's representations and omissions on the labeling of the Unilever Dry Shampoo Products are likely to mislead, deceive, confuse or confound consumers acting reasonably;

(f)    whether Unilever represents to consumers that the Unilever Dry Shampoo Products have characteristics, benefits, or qualities that they do not have;

(g)    whether Unilever had inadequate testing and safety standards, and had a duty to disclose, and wrongfully failed to disclose same;

(h)    whether Unilever had knowledge that its representations and/or omissions were false, deceptive, and/or misleading;

(i)    whether Unilever continues to make representations and/or omissions despite knowledge that the representations and/or omissions are false, deceptive, and/or misleading;

(j)    whether Unilever breached its express warranties;

(k)    whether Unilever breached its implied warranties;

(l)    whether Unilever engaged in fraudulent, deceptive, misleading, unlawful, and/or unfair trade practices;

(m)    whether Unilever engaged in false advertising;

(n)    whether Unilever made negligent and/or fraudulent misrepresentations and/or omissions;

(o)    whether Plaintiffs and the members of the Class and Subclasses are entitled to actual, statutory, and punitive damages;

(p)    whether Unilever unjustly retained a benefit such that restitution is appropriate; and

(q)    whether Plaintiffs and members of the Class and Subclasses are entitled to declaratory and injunctive relief.

112.    **Typicality (Rule 23(a)(3))**.  Plaintiffs' claims are typical of the claims of the proposed Classes and Subclasses.  Plaintiffs and the Classes and Subclasses (as applicable) suffered injuries because of Unilever's wrongful conduct that is uniform across the Classes and Subclasses.

113.    **Adequacy (Rule 23(a)(4))**.  Plaintiffs have and will continue to represent and protect the interests of the Classes and Subclasses fairly and adequately.  Plaintiffs have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs have no interest that is antagonistic to those of the Classes and Subclasses, and Unilever has no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and Subclasses, and they have the resources to do so.  Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Classes and Subclasses.

114.    **Substantial Benefits**.  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of

this controversy and joinder of all members of the Classes and Subclasses is impracticable.  The prosecution of separate actions by individual members of the Classes and Subclasses would impose heavy burdens upon the Courts and Unilever, would create a risk of inconsistent or varying adjudications of the questions of law and fact common to members of the Classes and Subclasses, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

115.   Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the above common questions of law or fact predominate over any questions affecting individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

116.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Unilever acted or refused to act on grounds generally applicable to the Class and Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class and Subclasses as a whole.

117.   In the alternative, the common questions of fact and law, *supra*, are appropriate for issue certification on behalf of the proposed Class and Subclasses under Fed. R. Civ. P. 23(c)(4).

118.   Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### BREACH OF EXPRESS WARRANTY
**On Behalf of the Class or, Alternatively, the Subclasses**

119.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

120.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Unilever for breach of express warranty.

121.     Unilever manufactured, distributed, packaged, labeled, marketed, and sold the Unilever Dry Shampoo Products into the stream of commerce with the intent that the Unilever Dry Shampoo Products would be purchased by Plaintiffs and the Class and Subclasses.

122.     Unilever expressly warranted, advertised, and represented to Plaintiffs and the Class and Subclasses that the Unilever Dry Shampoo Products were safe and appropriate for human use.

123.     Unilever made these express warranties regarding the Unilever Dry Shampoo Products' quality and fitness for use in writing through its website, advertisements, and marketing materials and on the Unilever Dry Shampoo Products' packaging and labels.  These express warranties became part of the basis of the bargain that Plaintiffs and the Class and Subclasses entered into upon purchasing the Unilever Dry Shampoo Products.  These affirmations of fact and/or promises became part of the basis of the bargain, and the contract, that Plaintiffs and the Class and Subclasses entered into with Unilever upon purchasing the Unilever Dry Shampoo Products.

124.     Unilever's advertisements, warranties, and representations were made in connection with the sale of the Unilever Dry Shampoo Products to Plaintiffs, the Class, and the Subclasses.  Plaintiffs, the Class, and Subclasses relied on Unilever's advertisements, warranties,

and representations regarding the Unilever Dry Shampoo Products in deciding whether to purchase Unilever's products.

125.    Unilever's Products do not conform to Unilever's affirmations of fact and promises in that they are not safe, healthy, and appropriate for human use.

126.    Unilever therefore breached its express warranties by placing Products into the stream of commerce and selling them to consumers, when their use had dangerous effects and was unsafe, rendering these products unfit for their intended use and purpose, and unsafe and unsuitable for consumer use as marketed by Unilever.  These associated health effects substantially impair the use, value, and safety of the Unilever Dry Shampoo Products.

127.    Unilever was aware, or should have been aware, of the presence of the human carcinogen benzene in the Unilever Dry Shampoo Products and therefore was aware or should have been aware of the toxic or dangerous health effects of the use of the Unilever Dry Shampoo Products, but nowhere on the package labeling on Unilever's websites, or other marketing materials did Unilever warn Plaintiffs and members of the Class and Subclasses of the presence of benzene, or of the material risk of benzene, in the Unilever Dry Shampoo Products or the dangers it posed.

128.    Instead, Unilever concealed the presence of benzene in the Unilever Dry Shampoo Products and deceptively represented that the Unilever Dry Shampoo Products were safe, healthy, and appropriate for human use.  Unilever thus utterly failed to ensure that the material representations it was making to consumers were true.

129.    Benzene was present in the Unilever Dry Shampoo Products when they left Unilever's possession or control and were sold to Plaintiffs, members of the Class and Subclasses. The dangers associated with use of the Unilever Dry Shampoo Products were undiscoverable by

Plaintiffs, members of the Class and Subclasses at the time of purchase of the Unilever Dry Shampoo Products.

130.    Unilever is the manufacturer, marketer, advertiser, distributor, labeler, and seller of the Unilever Dry Shampoo Products and thus had exclusive knowledge and notice of the fact that the Unilever Dry Shampoo Products did not conform to the affirmations of fact and promises.

131.    In addition, or in the alternative, to the formation of an express contract, Unilever made each of the above-described representations to induce Plaintiffs and members of the Class and Subclasses to rely on such representations.

132.    Unilever's affirmations of fact and promises were material, and Plaintiffs and members of the Class and Subclasses reasonably relied upon such representations in purchasing the Unilever Dry Shampoo Products.

133.    All conditions precedent to Unilever's liability for its breach of express warranty have been performed by Plaintiffs or members of the Class or Subclasses.

134.    Affording Unilever an opportunity to cure its breaches of written warranties would be unnecessary and futile here.  Unilever had ample opportunity to test its products for benzene and to modify its manufacturing processes to ensure benzene was not present in the Unilever Dry Shampoo Products to make them safe and healthy for use by Plaintiffs and members of the Class and Subclasses.

135.    In any event, Unilever was provided with pre-suit notice of its breaches of warranty when certain Plaintiffs sent Unilever a letter containing the basis of their claims.

136.    As a direct and proximate result of Unilever's breaches of express warranty, Plaintiffs and members of the Classes and Subclasses have been damaged because they did not receive the products as specifically warranted by Unilever.  Plaintiffs and members of the Class

and Subclasses did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their payment and/or overpayment for the Unilever Dry Shampoo Products.

137.    Plaintiffs and the Class and Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Unilever's failure to deliver goods conforming to their express warranties and resulting breach.

## SECOND CLAIM FOR RELIEF

### BREACH OF IMPLIED WARRANTY
### On Behalf of the Class or, Alternatively, the Subclasses

138.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Unilever for breach of implied warranty of merchantability.

140.    Unilever is a merchant, manufacturer, marketer, warrantor, and seller of goods – the Unilever Dry Shampoo Products – to Plaintiffs and the Class and Subclasses and knew or had reason to know of the specific use for which the Unilever Dry Shampoo Products were purchased.

141.    Plaintiffs and the proposed Class and Subclass are consumers who purchased the Unilever Dry Shampoo Products manufactured, sold, and marketed by Unilever throughout the United States.

142.    An implied warranty that the Unilever Dry Shampoo Products were merchantable arose by operation of law as part of the sale of the Unilever Dry Shampoo Products.

143.    At all times mentioned herein, Unilever manufactured, distributed, or supplied Products, and prior to the time the Unilever Dry Shampoo Products were purchased by Plaintiffs and the Class and Subclasses, Unilever impliedly warranted to them that the Unilever Dry Shampoo Products were of merchantable quality, fit for their ordinary and intended use, and conformed to the promises and affirmations of fact made on the Unilever Dry Shampoo Products'

labels and packaging, including that the Unilever Dry Shampoo Products were safe and appropriate for human use. Plaintiffs and the Class and Subclasses relied on Unilever's promises and affirmations of fact when they purchased the Unilever Dry Shampoo Products.

144. Benzene existed in the Unilever Dry Shampoo Products when the Unilever Dry Shampoo Products left Unilever's possession or control and were sold to Plaintiffs and members of the proposed Class and Subclasses. The presence of benzene in the Unilever Dry Shampoo Products was undiscoverable by Plaintiffs and members of the proposed Class and Subclasses at the time of their purchases.

145. Contrary to these representations and warranties, the Unilever Dry Shampoo Products were not merchantable or reasonably fit for either the use they were intended or the uses reasonably foreseeable by Unilever and did not conform to Unilever's affirmations of fact and promises as use of the Unilever Dry Shampoo Products was accompanied by the risk of exposure to benzene and to developing benzene-caused cancers, which does not conform to the packaging.

146. Unilever breached its implied warranties by selling Products that failed to conform to the promises or affirmations of fact made on the packaging or label as use of each Product was accompanied by the risk of exposure to benzene and to developing benzene-caused cancers, which does not conform to the packaging, rendering the Unilever Dry Shampoo Products unfit for their intended use and purpose and impairing the use, value, and safety of the Unilever Dry Shampoo Products. Unilever had, and has, exclusive knowledge of the material facts concerning the defective nature of the Unilever Dry Shampoo Products.

147. Unilever was, or should have been, on notice of this breach, as it was on notice that the process used to manufacture the Unilever Dry Shampoo Products was likely to result in the presence of benzene in the Unilever Dry Shampoo Products.

148.    In any event, Unilever was provided with pre-suit notice of its breaches of warranty when certain Plaintiffs sent Unilever a letter containing the basis of their claims.

149.    Privity exists because Unilever impliedly warranted to Plaintiffs and the Class and Subclasses through the warranting, packaging, advertising, marketing, and labeling that Products were natural, and suitable for use and made no mention of the attendant health risks associated with use of the Unilever Dry Shampoo Products.

150.    Furthermore, Plaintiffs and members of the proposed Class and Subclasses were at all material times the intended third-party beneficiaries of Unilever and its agents in the distribution of the sale of its Products.  Unilever exercises substantial control over the outlets that sell the Unilever Dry Shampoo Products, which are the same means by which Plaintiff and members of the proposed Class and Subclasses purchased the Unilever Dry Shampoo Products. Unilever's warranties are not intended to apply to distributors but are instead intended to apply to consumers, including Plaintiffs and the proposed Class and Subclasses, to whom Unilever directly markets through labels and product packaging, and who review the labels and product packaging in connection with their purchases.  As a result, the warranties are designed and intended to benefit the consumers, including Plaintiffs and the proposed Class and Subclasses, who purchase the Unilever Dry Shampoo Products.  Privity therefore exists based on the foregoing and because Unilever impliedly warranted to Plaintiffs and the proposed Class and Subclasses through the packaging that the Unilever Dry Shampoo Products were safe and suitable for human use.

151.    As a direct and proximate result of Unilever's conduct, Plaintiffs, the Class, and the Subclasses have suffered actual damages in that each of the Unilever Dry Shampoo Products they purchased is worth less than the price they paid and/or that they would not have purchased at all if

they had known of the attendant health risks associated with the use of each of the Unilever Dry Shampoo Products.

152.     Plaintiffs, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Unilever's failure to deliver goods conforming to their implied warranties and resulting breach.

## THIRD CLAIM FOR RELIEF

### FRAUDULENT MISREPRESENTATION
**On Behalf of the Class or, Alternatively, the Subclasses**

153.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

154.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Unilever for fraudulent misrepresentation.

155.     Unilever falsely represented to Plaintiffs, the Class, and the Subclasses that the Unilever Dry Shampoo Products did not contain unsafe levels of carcinogens and were safe for human use.   The Products, however, contained, or had a significant risk of containing, the carcinogenic benzene, which does not conform to the packaging.   Therefore, Unilever has made misrepresentations about the Unilever Dry Shampoo Products.

156.     Unilever's misrepresentations regarding the Unilever Dry Shampoo Products are material to a reasonable consumer because they relate to the safety, quality, and cancer-causing properties of the Unilever Dry Shampoo Products.   A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the Unilever Dry Shampoo Products.

157.     Unilever intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiffs, the Class, and the Subclasses to purchase the Unilever Dry Shampoo Products.

158.    Unilever knew that its representations about the Unilever Dry Shampoo Products were false, or that there was a significant likelihood that they were false, in that the Unilever Dry Shampoo Products either did contain, or had a significant risk of containing, unsafe amounts of the carcinogen benzene, which does not conform to the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.   Unilever knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiffs, the Class, and the Subclasses.

159.    Plaintiffs, the Class, and the Subclasses did in fact rely on these misrepresentations and purchased Products to their detriment.   Given the deceptive way Unilever advertised, represented, and otherwise promoted the Unilever Dry Shampoo Products, the reliance Plaintiffs, the Class, and the Subclasses placed on Unilever's misrepresentations was justifiable.

160.    As a direct and proximate result of Unilever's conduct, Plaintiffs, the Class, and the Subclasses have suffered actual damages in that they purchased Products that were worth less than the price they paid and/or that they would not have purchased at all had they known of the risk of the presence of unsafe levels of benzene in the Unilever Dry Shampoo Products and the health risks, including cancer, associated with the use of the Unilever Dry Shampoo Products that does not conform with the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.

161.    Plaintiffs, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FOURTH CLAIM FOR RELIEF

### FRAUD BY OMISSION
### On Behalf of the Class or, Alternatively, the Subclasses

162.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

163.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclass against Unilever for fraud by omission.

164.    Unilever actively and knowingly concealed from and failed to disclose to Plaintiffs, the Class, and the Subclasses that use of Products is accompanied by a risk of exposure to the carcinogen benzene, which carries with it the risk of developing benzene-caused cancers and which does not conform to the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.

165.    Unilever was under a duty to disclose to Plaintiffs, the Class, and the Subclasses the true safety, quality, characteristics, fitness for use, and suitability of the Unilever Dry Shampoo Products because: (1) Unilever was in a superior position to know the true state of facts about its Products; (2) Unilever was in a superior position to know the risks associated with the use of, characteristics of, and suitability of the Unilever Dry Shampoo Products for use by individuals; (3) Unilever knew that Plaintiffs, the Class, and the Subclasses could not reasonably have been expected to learn or discover that the Unilever Dry Shampoo Products were misrepresented in the packaging, labels, advertising, and websites prior to purchasing the Unilever Dry Shampoo Products; (4) Unilever's packaging and labels disclosed misleading information to consumers by omitting that the Unilever Dry Shampoo Products contain (or have a material risk of containing) benzene; and (5) based on Unilever's partial statements on the Unilever Dry Shampoo Products' labels and packaging that gave a misleading impression to reasonable consumers that the Unilever Dry Shampoo Products are safe and suitable for use, without further information on the presence

of, and material risk of, benzene that had not been disclosed, Unilever assumed the obligation to make a full and fair disclosure of the whole truth.

166.    Unilever knows its customers trust the quality of its products and that they expect the Unilever Dry Shampoo Products to be safe and suitable for use and to not contain or have a risk of containing carcinogenic benzene. Unilever also knows that certain consumers seek out and wish to purchase personal care products that possess high-quality ingredients free of toxins, contaminants, or chemicals, and that these consumers will pay more for those personal care products that they believe possess these qualities.

167.    Due to the omissions on the Unilever Dry Shampoo Products' packaging, Unilever had a duty to disclose the whole truth about the presence, and material risk, of carcinogenic benzene in the Unilever Dry Shampoo Products to Plaintiffs and the proposed Class and Subclasses. Unilever failed to discharge its duty to disclose the presence or risk of benzene in the Unilever Dry Shampoo Products.

168.    The facts concealed or not disclosed by Unilever to Plaintiffs, the Class, and the Subclasses were material in that a reasonable consumer would have considered them important when deciding whether to purchase the Unilever Dry Shampoo Products.

169.    Plaintiffs and the Class and Subclasses justifiably relied on Unilever's omissions to their detriment. The detriment is evident from the true quality, characteristics, and risk associated with the use of Products, which is inferior when compared to how Products are advertised and represented by Unilever.

170.    As a direct and proximate result of Unilever's conduct, Plaintiffs, the Class, and the Subclasses have suffered actual damages in that they purchased Products that were worth less than the price they paid and/or that they would not have purchased at all had they known of the health

risks associated with the use of the Unilever Dry Shampoo Products which do not conform to the Unilever Dry Shampoo Products' labels, packaging, advertising, and statements.

171.    Plaintiffs, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## FIFTH CLAIM FOR RELIEF

### NEGLIGENT MISREPRESENTATION
### On Behalf of the Class or, Alternatively, the Subclasses

172.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

173.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Unilever for negligent misrepresentation.

174.    Because Unilever has superior knowledge regarding the quality and safety of its ingredients and products and because Plaintiffs and members of the proposed Class and Subclasses trust and rely on Unilever to provide accurate and truthful information regarding the Unilever Dry Shampoo Products, which Plaintiffs and members of the proposed Class and Subclasses cannot ascertain on their own, Unilever had a duty to Plaintiffs, the Class, and the Subclasses to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, distribution, and sale of Products.

175.    Unilever breached its duty to Plaintiffs, the Class, and the Subclasses by developing, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiffs, the Class, and the Subclasses that did not have the ingredients, qualities, characteristics, and suitability for use as advertised by Unilever.

176.    Unilever packaged, labeled, marketed, and advertised the Unilever Dry Shampoo Products in a manner indicating that the Unilever Dry Shampoo Products were and are, among

other things, safe and suitable for use.  However, the Unilever Dry Shampoo Products contained, or were at risk of containing, carcinogenic benzene, which does not conform to the packaging. Therefore, Unilever has made misrepresentations about the Unilever Dry Shampoo Products.

177.    Unilever's misrepresentations regarding the Unilever Dry Shampoo Products are material to a reasonable consumer because they relate to the ingredients, safety, and quality of the Unilever Dry Shampoo Products, which the consumer is receiving and paying for.  A reasonable consumer would attach importance to such representations and would be induced to act thereon in deciding whether or not to purchase the Unilever Dry Shampoo Products.

178.    At all relevant times when such misrepresentations were made, Unilever knew or had been negligent in not knowing that the Unilever Dry Shampoo Products contained, or were at risk of containing, carcinogenic benzene.  Unilever has no reasonable grounds for believing its misrepresentations were not false and misleading.

179.    Unilever knew or should have known that the ingredients, qualities, and characteristics of the Unilever Dry Shampoo Products were not as advertised or suitable for their intended use and were otherwise not as warranted and represented by Unilever yet continued selling the Unilever Dry Shampoo Products.  Specifically, Unilever knew or should have known that: (1) the manufacturing process used to produce the Unilever Dry Shampoo Products resulted in the presence of benzene in the Unilever Dry Shampoo Products or a substantial risk that benzene would be found in the Unilever Dry Shampoo Products, and (2) the Unilever Dry Shampoo Products were otherwise not as warranted and represented by Unilever.

180.    Unilever intended that Plaintiffs and members of the proposed Class and Subclasses would rely on these representations, as evidenced by the intentional and conspicuous placement of the misleading representations on the Unilever Dry Shampoo Products' packaging by Unilever, as

well as its advertising, marketing, and labeling of the Unilever Dry Shampoo Products as, among other things, safe and suitable for use.

181.     Plaintiffs and members of the proposed Class and Subclasses have reasonably and justifiably relied on Unilever's negligent misrepresentations when purchasing the Unilever Dry Shampoo Products, and had the correct facts been known, would not have purchased the Unilever Dry Shampoo Products at all, or would have paid less for them.

182.     As a direct and proximate result of Unilever's conduct, Plaintiffs, the Class, and the Subclasses have suffered actual damages in that they purchased Products that were worth less than the price they paid and/or that they would not have purchased at all had they known they contained, or had a material risk of containing, the carcinogen benzene that is known to cause the Benzene-caused Cancers which does not conform to the products' labels, packaging, advertising, and statements.

183.     Plaintiffs, the Class, and the Subclasses seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT
### On Behalf of the Class or, Alternatively, the Subclasses

184.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

185.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Unilever for unjust enrichment.

186.     Plaintiffs, the Class, and the Subclasses conferred substantial benefits on Unilever through their purchase and use of Products.  Unilever knowingly and willingly accepted and enjoyed these benefits.

187.    Unilever either knew or should have known that the payments rendered by Plaintiffs, the Class, and the Subclasses were given with the expectation that the Unilever Dry Shampoo Products would have the qualities, characteristics, and suitability for use represented and warranted by Unilever.  As such, it would be inequitable for Unilever to retain the benefit of the payments under these circumstances when Plaintiffs and the proposed Class and Subclasses did not receive the benefit of the Unilever Dry Shampoo Products for which they bargained.

188.    Unilever's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Unilever to retain the benefits without payment of the value to Plaintiffs, the Class, and the Subclasses because Unilever's labeling of the Unilever Dry Shampoo Products was misleading to consumers, which caused injuries to Plaintiffs and the proposed Class and Subclasses because they would not have purchased the Unilever Dry Shampoo Products or would have paid less for the Unilever Dry Shampoo Products had they known that they contained, or had a material risk of containing, carcinogenic benzene.

189.    As a direct and proximate result, Plaintiffs, the Class, and the Subclasses are entitled to recover from Unilever all amounts wrongfully collected and improperly retained by Unilever, plus interest thereon.

190.    Plaintiffs and the proposed Class and Subclasses seek restitution, disgorgement, imposition of a constructive trust, and/or other appropriate injunctive and declaratory relief, and any other just and proper relief available under the laws.

### SEVENTH CLAIM FOR RELIEF

**CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**Conn. Gen. Stat. Ann. § 42-110a,** *et seq.*
**Brought on behalf of Connecticut Plaintiff and Connecticut Subclass**

191.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

192.    Connecticut Plaintiff and Connecticut Subclass Members are or were residents of Connecticut.

193.    Defendant is a "person" as defined by C.G.S.A. § 42-110a(3).

194.    Connecticut Plaintiff and Connecticut Subclass Members are actual or potential consumers of Unilever Dry Shampoo Products purchased in Connecticut.

195.    At all times mentioned herein, Unilever engaged in "trade" or "commerce" in Connecticut as defined by C.G.S.A. § 42-110a(4), in that it engaged in the "advertising," "sale," and "distribution" of any "goods," "services," "property," "articles," "commodities," or "things of value" in Connecticut.

196.    The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." C.G.S.A. § 42-110b(a).

197.    For the reasons discussed herein, Unilever violated and continues to violate CUTPA by engaging in the herein described deceptive or unfair acts or practices proscribed by C.G.S.A. § 42-110a. et seq. Unilever's acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

198.    Unilever repeatedly advertised on the labels for the Unilever Dry Shampoo Products, on its websites, and through national advertising campaigns, among other items, that the Unilever Dry Shampoo Products were and are safe, suitable and fit for their intended use and purpose.  Unilever failed to disclose the material information that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene.

199.    Unilever's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Unilever Dry Shampoo Products without being aware that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene. As a direct and proximate result of Unilever's unfair and deceptive acts or practices, Connecticut Plaintiff and Connecticut Subclass Members suffered damages by purchasing the Unilever Dry Shampoo Products in reliance on Unilever's statements because they would not have purchased the Unilever Dry Shampoo Products had they known the truth, and they received a product that was worthless, and/or worth less, because it contains or materially risks containing carcinogenic benzene.

200.    Unilever's deceptive trade practices caused injury in fact and actual damages to Connecticut Plaintiff and Connecticut Subclass Members in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products Connecticut Plaintiff and Connecticut Subclass members purchased, which allowed Unilever to profit at the expense of Connecticut Plaintiff and Connecticut Subclass Members. The injuries to Connecticut Plaintiff and Connecticut Subclass Members were to legally protected interests. The gravity of the harm of Unilever's actions is significant and there is no corresponding benefit to consumers of such conduct.

201.    Unilever's unlawful conduct is continuing, with no indication of Unilever's intent to cease this fraudulent course of conduct, posing a threat of future harm to Connecticut Plaintiff and Connecticut Subclass Members, such that prospective injunctive relief is necessary. Connecticut Plaintiff and Connecticut Subclass Members seek relief for the injuries they have suffered as a result of Unilever's unfair and deceptive acts and practices, including, but not limited to, actual damages, restitution, penalties, injunctive and declaratory relief, attorneys' fees and

costs, as well as any other just and proper relief, pursuant to C.G.S.A. § 42-110g and applicable law.

## EIGHTH CLAIM FOR RELIEF

### CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT
### Cal. Civ. Code §§1750 *et seq.*
### On Behalf of Plaintiffs and California Subclass

202.    Plaintiffs incorporate the forgoing allegations as if fully set forth herein.

203.    Plaintiffs and the California Subclass are or were residents of California and purchased the Unilever Dry Shampoo Products in California.

204.    Plaintiffs and the California Subclass have provided Unilever notice of the specific complaint and damages in accordance with Cal. Civ. Code §1761.

205.    Plaintiffs have also filed an affidavit in accordance with Cal. Civ. Code § 1780 concurrently with this Consolidated Amended Complaint.

206.    Plaintiffs and the California Subclass are "consumer[s]" as that term is defined in Cal. Civ. Code §1761(d).

207.    The Products are "goods," as that term is defined in Cal. Civ. Code §1761(a).

208.    Unilever is a "person" as that term is defined in Cal. Civ. Code §1761(c).

209.    Each purchase of the Unilever Dry Shampoo Products by Plaintiffs and the California Subclass constituted a "transaction" as that term is defined in Cal. Civ. Code §1761(e).

210.    Unilever's conduct alleged herein violates the following provisions of California's Consumers Legal Remedies Act (the "CLRA"):

    A.    Cal. Civ. Code §1770(a)(5), by negligently, recklessly, and/or intentionally representing that the Unilever Dry Shampoo Products were and are safe for use by individuals when in fact they contain, or have a material risk of containing, an unsafe chemical, benzene, which could cause a Product user to develop Benzene-caused cancers;

B.     Cal. Civ. Code §1770(a)(7), by negligently, recklessly, and/or intentionally representing that the Unilever Dry Shampoo Products were of a particular standard, quality, or grade, when they were of another;

C.     Cal. Civ. Code §1770(a)(9), by negligently, recklessly, and/or intentionally advertising the Unilever Dry Shampoo Products with intent not to sell them as advertised; and

D.     Cal. Civ. Code §1770(a)(16), by representing that the Unilever Dry Shampoo Products have been supplied in accordance with previous representations when they have not.

211.    Unilever was obligated to disclose the presence of, and material risk of, carcinogenic benzene in the Unilever Dry Shampoo Products because:  (a) Unilever had exclusive knowledge of the presence of benzene in the Unilever Dry Shampoo Products that were not known or reasonably accessible to Plaintiffs and the California Subclass; (b) Unilever actively concealed the presence of carcinogenic benzene in the Unilever Dry Shampoo Products from Plaintiffs and the California Subclass; and (c) Unilever made partial statements on the Unilever Dry Shampoo Products labels and packaging that gave the misleading impression to reasonable consumers, including Plaintiffs and the California Subclass, without further information on the presence of carcinogenic benzene that had not been disclosed.

212.    Plaintiffs and the California Subclass relied on Unilever's representations when purchasing the Unilever Dry Shampoo Products.

213.    Plaintiffs and the California Subclass were deceived by Unilever's deceptive, fraudulent, and unconscionable acts and practices in that had they known the truth they would not have purchased the Unilever Dry Shampoo Products or would have paid less for the Unilever Dry Shampoo Products.

214.     As a direct and proximate result of these violations, Plaintiffs and the California Subclass have been harmed, and that harm will continue unless Unilever is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Unilever Dry Shampoo Products.

215.     Unilever's deceptive trade practices caused injury in fact and actual damages to Plaintiffs and the California Subclass in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products Plaintiffs and the California Subclass purchased, which allowed Unilever to profit at the expense of Plaintiffs and the California Subclass.

216.     Plaintiffs and the California Subclass seek relief for the injuries they have suffered because of Unilever's practices, as provided by the CLRA and applicable law.

217.     In addition, Unilever's unlawful conduct is continuing, with no indication of Unilever's intent to cease this fraudulent course of conduct, posing a threat of future harm to Plaintiffs and California Subclass, such that prospective injunctive relief is necessary.

## NINTH CLAIM FOR RELIEF

### CALIFORNIA'S FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code §§17500 *et seq*.
### On Behalf of Plaintiffs and California Subclass

218.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

219.     Plaintiffs and the California Subclass are or were residents of California and purchased the Unilever Dry Shampoo Products in California.

220.     California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading."  Cal. Bus. & Prof. Code §17500.

221.     Unilever's untrue and misleading statements significantly impacted the public because Unilever sells the Unilever Dry Shampoo Products nationwide, including in California,

and there are millions of consumers of the Unilever Dry Shampoo Products, including Plaintiffs and California Subclass.

222.    As set forth herein, Unilever's claims that the Unilever Dry Shampoo Products were and are safe for use by individuals were false because the Unilever Dry Shampoo Products in fact they contain or have a material risk of containing an unsafe chemical, benzene, which could cause a user to suffer adverse health effects from use of the Unilever Dry Shampoo Products and were likely to deceive the public.

223.    Unilever's claims that the Unilever Dry Shampoo Products were and are safe for use by individuals were and are untrue and misleading because they failed to mention the presence of an unsafe chemical, benzene, which could cause a Product user to suffer adverse health effects from use of the Unilever Dry Shampoo Products.

224.    Unilever's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Unilever Dry Shampoo Products without being aware that the Unilever Dry Shampoo Products contained or had a material risk of containing carcinogenic benzene.

225.    Unilever knew, or reasonably should have known, that all these claims were untrue or misleading and likely to deceive the public.

226.    As a direct and proximate result of Unilever's false advertising, Plaintiffs and the California Subclass have been harmed, and that harm will continue unless Unilever is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Unilever Dry Shampoo Products.

227.    As a direct and proximate result of Unilever's false advertising, Plaintiffs and the California Subclass suffered damages by purchasing the Unilever Dry Shampoo Products because

they received a product that was worthless, and/or worth less, because it contains, or has a material risk of containing, carcinogenic benzene, and they would not have purchased or would have paid less for the Unilever Dry Shampoo Products had they known this fact.

228.    Unilever's false advertising caused injury in fact and actual damages to Plaintiffs and the California Subclass in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products Plaintiffs and the California Subclass purchased, which allowed Unilever to profit at the expense of Plaintiffs and the California Subclass.

229.    In addition, Unilever's unlawful conduct is continuing, with no indication of Unilever's intent to cease this fraudulent course of conduct, posing a threat of future harm to Plaintiffs and California Subclass, such that prospective injunctive relief is necessary.  Plaintiffs and the California Subclass are entitled to injunctive and equitable relief and restitution in the amount they spent on the Unilever Dry Shampoo Products, as well as any other just and proper relief, pursuant to Cal. Bus. & Prof. Code §17535 and applicable law.

### TENTH CLAIM FOR RELIEF

**CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**
**On behalf of Plaintiffs and California Subclass**

230.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

231.    Plaintiffs and the California Subclass are or were residents of California and/or purchased the Unilever Dry Shampoo Products in California.

232.    The California Unfair Competition Law prohibits any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code §17200.

233.    For the reasons discussed herein, Unilever violated and continues to violate the California's Unfair Competition Law by engaging in the herein described fraudulent, deceptive, unfair acts or practices proscribed by Cal. Bus. & Prof. Code §17200 *et seq*.  Unilever's acts and

practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

234.   Unilever fraudulently represented that the Unilever Dry Shampoo Products were and are safe for use by individuals when in fact they contain, or have a material risk of containing, an unsafe chemical, benzene, which could cause a Product user to develop cancer from use of the Unilever Dry Shampoo Products.

235.   As alleged herein, Unilever unlawfully advertised the Unilever Dry Shampoo Products using false or misleading claims, such that Unilever's actions as alleged herein violate at least the following laws:

        A.    California Consumers Legal Remedies Act, Cal. Civ. Code §1750 *et seq.*; and

        B.    California False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq.*

236.   Unilever's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Unilever Dry Shampoo Products is unfair because Unilever's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

237.   Unilever's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Unilever Dry Shampoo Products is also unfair because it violates public policy as declared by specific constitutional, statutory, or regulatory provisions, including, but not limited to, the California Consumers Legal Remedies Act and the California False Advertising Law.

238.   Unilever's conduct with respect to the labeling, packaging, advertising, marketing, and sale of the Unilever Dry Shampoo Products is also unfair because the consumer injury is

substantial, not outweighed by benefits to consumers or competition, and not one that consumers, themselves, can reasonably avoid.

239.    As a direct and proximate result of Unilever's false advertising, Plaintiffs and the California Subclass have been harmed, and that harm will continue unless Unilever is enjoined from using the misleading marketing described herein in any manner in connection with the advertising and sale of the Unilever Dry Shampoo Products.

240.    As a direct and proximate result of Unilever's fraudulent, unfair, and unlawful practices, Plaintiffs and the California Subclass suffered damages by purchasing the Unilever Dry Shampoo Products because they received a product that was worthless, and/or worth less, because it contains, or has a material risk of containing, carcinogenic benzene, and they would not have purchased or would have paid less for the Unilever Dry Shampoo Products had they known this fact.

241.    Unilever's fraudulent, unfair, and unlawful practices caused injury in fact and actual damages to Plaintiffs and the California Subclass in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products Plaintiffs and the California Subclass purchased, which allowed Unilever to profit at the expense of Plaintiffs and the California Subclass.

242.    In accordance with Cal. Bus. & Prof. Code §17203, Plaintiffs and the California Subclass seek an order enjoining Unilever from continuing to conduct business through fraudulent, unfair, or unlawful acts and practices.  Unilever's misconduct is continuing, with no indication of Unilever's intent to cease this fraudulent, unlawful, and unfair course of conduct, posing a threat of future harm to Plaintiffs and California Subclass, such that prospective injunctive relief is necessary.

243.    Plaintiffs and the California Subclass also seek an order for the restitution of all monies from the sale of the Unilever Dry Shampoo Products, which were unjustly acquired through acts of fraudulent, unfair, or unlawful acts and practices, as well as any other just and proper relief, pursuant to Cal. Bus. & Prof. Code §17203 and applicable law.

## ELEVENTH CLAIM FOR RELIEF

**NEW YORK CONSUMER PROTECTION LAW**
**N.Y. Gen. Bus. Law §349**
**Brought on behalf of New York Plaintiff and the New York Subclass**

244.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

245.    New York Plaintiff and New York Subclass members are or were residents of New York and/or purchased the Unilever Dry Shampoo Products in New York.

246.    New York Plaintiff and New York Subclass members are actual or potential consumers of the Unilever Dry Shampoo Products.

247.    At all times mentioned herein, Unilever engaged in "trade" or "commerce" in New York in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in New York.

248.    N.Y. Gen. Bus. Law §349(a) provides "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."

249.    For the reasons discussed herein, Unilever violated and continues to violate N.Y. Gen. Bus. Law §349 by engaging in the herein described deceptive or unfair acts or practices proscribed by N.Y. Gen. Bus. Law §349.  Unilever's acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

250.    Unilever's deceptive trade practices significantly impacted the public because Unilever sells the Unilever Dry Shampoo Products nationwide, including in New York, and there are millions of consumers of the Unilever Dry Shampoo Products, including New York Plaintiff and New York Subclass members.

251.    Unilever repeatedly advertised on the labels for the Unilever Dry Shampoo Products, on its websites, and through national advertising campaigns, among other items, that the Unilever Dry Shampoo Products were and are safe and suitable for individual use.  Unilever failed to disclose the material information that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene.

252.    Unilever's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Unilever Dry Shampoo Products without being aware that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene.  As a direct and proximate result of Unilever's unfair and deceptive acts or practices, New York Plaintiff and New York Subclass members suffered damages by purchasing the Unilever Dry Shampoo Products because they would not have purchased the Unilever Dry Shampoo Products had they known the truth, and they received a product that was worthless, and/or worth less, because it contains or materially risks containing carcinogenic benzene.

253.    Unilever's deceptive trade practices caused injury in fact and actual damages to New York Plaintiff and New York Subclass members in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products New York Plaintiff and New York Subclass members purchased, which allowed Unilever to profit at the expense of New York Plaintiff and New York Subclass members.  The injuries to New York Plaintiff and New York Subclass members were to

legally protected interests.  The gravity of the harm of Unilever's actions is significant and there is no corresponding benefit to consumers of such conduct.

254.    Unilever's conduct is ongoing and continuing, such that prospective injunctive relief is necessary pursuant to N.Y. Gen. Bus. Law §349(h), with no indication of Unilever's intent to cease this fraudulent course of conduct, posing a threat of future harm to New York Plaintiff and New York Subclass members, such that prospective injunctive relief is necessary.

255.    New York Plaintiff and New York Subclass members seek actual damages and attorneys' fees and are entitled to injunctive and equitable relief for the injuries they have suffered as a result of Unilever's unfair and deceptive acts and practices, including, but not limited to, actual damages, restitution, penalties, injunctive and declaratory relief, attorneys' fees and/or costs, as well as any other just and proper relief, as provided by N.Y. Gen. Bus. Law §349 and applicable law.

## TWELFTH CLAIM FOR RELIEF

### TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT
Tex. Bus. & Com. Code §17.41, *et seq.*
Brought on behalf of Texas Plaintiff and the Texas Subclass

256.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

257.    Texas Plaintiff and Texas Subclass members are or were residents of Texas and consumers within the meaning of the Texas Deceptive Trade Practices Act ("TDTPA"), Tex. Bus. & Com. Code §17.45(4), who purchased the Unilever Dry Shampoo Products in Texas.

258.    Plaintiffs provided Unilever written notice of the specific complaint and damages to Unilever in accordance with Tex. Bus. & Com. Code §17.505 by, *inter alia*, a letter containing the basis of Plaintiffs' claims.

259.    At all material times herein, Unilever engaged in "trade" or "commerce" as defined by the TDTPA, Tex. Bus. & Com. Code §17.45(4).

260.     The TDTPA, Tex. Bus. & Com. Code §17.46(a), makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

261.     For the reasons discussed herein, Unilever violated and continues to violate the TDTPA by engaging in the herein described unconscionable, false, misleading, deceptive, and unfair acts or practices proscribed by the TDTPA Tex. Bus. & Com. Code §§17.41, *et seq*., including but not limit the following:

a.       representing that the Unilever Dry Shampoo Products have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, in violation of Tex. Bus. & Com. Code §17.46(b)(5);

b.       representing that goods or services are of a particular standard, quality, or grade when they are of another, Tex. Bus. & Com. Code §17.46(b)(7);

c.       advertising goods or services with intent not to sell them as advertised, Tex. Bus. & Com. Code §17.46(b)(9); and

d.       failing to disclose information concerning its goods or services which was known at the time of the transaction and such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed, Tex. Bus. & Com. Code §17.46(b)(24).

262.     Unilever's acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably in reliance on Unilever's acts and practices under the circumstances, to their detriment.

263.     Unilever repeatedly advertised, on the labels for the Unilever Dry Shampoo Products, on its websites, and through national advertising campaigns, among other items, that the

Unilever Dry Shampoo Products were and are safe and suitable for individual use.  Unilever failed to disclose the material information that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene.

264.    Unilever's representations and omissions were material because they were likely to deceive reasonable consumers to rely and induce them to purchase the Unilever Dry Shampoo Products without being aware that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene.

265.    As a direct and proximate result of Unilever's unfair and deceptive acts or practices, Texas Plaintiff and Texas Subclass members suffered damages by purchasing the Unilever Dry Shampoo Products because they would not have purchased the Unilever Dry Shampoo Products had they known the truth, and they received a product that was worthless, and/or worth less, because it contains or materially risked containing carcinogenic benzene.

266.    Unilever's deceptive trade practices caused injury in fact and actual damages to Texas Plaintiff and Texas Subclass members in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products Texas Plaintiff and Texas Subclass members purchased, which allowed Unilever to profit at the expense of Texas Plaintiffs and Texas Subclass members. The injuries to Texas Plaintiffs and Texas Subclass members were to legally protected interests. The gravity of the harm of Unilever's actions is significant and there is no corresponding benefit to consumers of such conduct.

267.    Unilever's unlawful conduct is continuing, with no indication of Unilever's intent to cease this fraudulent course of conduct, posing a threat of future harm to Texas Plaintiff and Texas Subclass members, such that prospective injunctive relief is necessary.

268.     Texas Plaintiff and Texas Subclass members seek relief for the injuries they have suffered as a result of Unilever's unfair and false, misleading, or deceptive acts and practices, including, but not limited to, actual damages, restitution, penalties, injunctive and declaratory relief, attorneys' fees and/or costs, as well as any other just and proper relief, as provided by Tex. Bus. & Com. Code Ann. §17.50 and applicable law.

<u>**THIRTEENTH CLAIM FOR RELIEF**</u>

**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**ILCS Ch. 815, ACT 505, *et seq*.**
**Brought on behalf of Illinois Plaintiff and the Illinois Subclass**

269.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

270.     Illinois Plaintiff and Illinois Subclass members are or were residents of Illinois and/or purchased the Unilever Dry Shampoo Products in Illinois.

271.     Unilever is a "person" as defined by 815 ILCS 505/1.

272.     Illinois Plaintiff and Illinois Subclass members are actual or potential consumers as defined by 815 ILCS 505/1(e) of the Unilever Dry Shampoo Products.

273.     At all times mentioned herein, Unilever engaged in "trade" or "commerce" in Illinois as defined by 815 ILCS 505/1(f), in that they engaged in the "advertising," "offering for sale," "sale," and "distribution" of any "property," "article," "commodity" or "thing of value" in Illinois.

274.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") provides that "…[u]nfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any

practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act'… in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

275.   For the reasons discussed herein, Unilever violated and continues to violate ICFA by engaging in the herein described deceptive or unfair acts or practices proscribed by 815 ILCS 505/1, *et seq*.  Unilever's acts and practices, including its material omissions, described herein, were intended to, likely to, and did in fact, deceive and mislead members of the public, including consumers acting and relying reasonably under the circumstances, to their detriment.

276.   Unilever repeatedly advertised on the labels for the Unilever Dry Shampoo Products, on its websites, and through national advertising campaigns, among other items, that the Unilever Dry Shampoo Products were and are safe, suitable, and fit for their intended purpose use and purpose.  Unilever failed to disclose the material information that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene.

277.   Unilever's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Unilever Dry Shampoo Products without being aware that the Unilever Dry Shampoo Products contained or materially risked containing carcinogenic benzene. As a direct and proximate result of Unilever's unfair and deceptive acts or practices, Illinois Plaintiff and Illinois Subclass members suffered damages by purchasing the Unilever Dry Shampoo Products in reliance on Unilever's statements because they would not have purchased the Unilever Dry Shampoo Products had they known the truth, and they received a product that was worthless, and/or worth less, because it contains or materially risks containing carcinogenic benzene.

278.    Unilever's deceptive trade practices caused injury in fact and actual damages to Illinois Plaintiff and Illinois Subclass members in the form of the loss or diminishment of value of the Unilever Dry Shampoo Products Illinois Plaintiff and Illinois Subclass members purchased, which allowed Unilever to profit at the expense of Illinois Plaintiff and Illinois Subclass members. The injuries to Illinois Plaintiff and Illinois Subclass members were to legally protected interests. The gravity of the harm of Unilever's actions is significant and there is no corresponding benefit to consumers of such conduct.

279.    Unilever's unlawful conduct is continuing, with no indication of Unilever's intent to cease this fraudulent course of conduct, posing a threat of future harm to Illinois Plaintiff and Illinois Subclass members, such that prospective injunctive relief is necessary.

280.    Illinois Plaintiff and Illinois Subclass members seek relief for the injuries they have suffered as a result of Unilever's unfair and deceptive acts and practices, including, but not limited to, actual damages, restitution, penalties, injunctive and declaratory relief, attorneys' fees and/or costs, as well as any other just and proper relief, as provided by 815 ILCS 505/10a and applicable law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment against Unilever as to each count, including:

A.    An order certifying this action as a class action, certifying the Class and Subclasses requested herein, designating Plaintiffs as the representatives of the Class and Subclasses, appointing Plaintiffs' counsel as counsel to the Class and Subclasses, and requiring Unilever to bear the costs of a class action;

B.     An order declaring that Unilever's actions constitute: (i) breach of express warranty; (ii) breach of the implied warranty of merchantability; (iii) fraudulent misrepresentation; (iv) fraud by omission; (v) negligent misrepresentation; (vi) unjust enrichment; and (vii) unfair and deceptive business practices in violation of the identified state law consumer protection statutes, and that Unilever is liable to Plaintiffs, members of the Class, and members of the Subclasses, as described herein, for the relief arising therefrom;

C.     An order enjoining Unilever from selling the Products until benzene is eliminated or full disclosure of the presence of benzene appears on all labels, packaging, and advertising, and requiring Unilever to engage in testing of the Products to measure or detect benzene;

D.     An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Unilever from continuing the unlawful practices alleged herein, and injunctive relief to remedy Unilever's past conduct;

E.     A judgment awarding Plaintiffs and members of the Classes and Subclasses all appropriate economic, monetary, actual, statutory, consequential damages, in an amount to be determined at trial;

F.     A judgment awarding Plaintiff and members of the Class and Subclasses restitution and/or disgorgement of all profits and unjust enrichment that Unilever obtained from Plaintiffs and members of the Class and Subclasses as the result of its unlawful, unfair, fraudulent business practices described herein;

G.     A judgment awarding Plaintiffs and members of the Classes and Subclasses prejudgment and post-judgment interest, as permitted by law;

H.     A judgment awarding Plaintiffs and members of the Class and Subclasses punitive damages, as allowed by law;

I.      A judgment awarding Plaintiffs and members of the Classes and Subclasses costs

and fees, including attorneys' fees, as permitted by law; and

J.      For such further relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

DATED:  September 21, 2022

_/s/ Steven L. Bloch   ct31246_
**SILVER GOLUB & TEITELL LLP**
Steven L. Bloch  ct31246
Ian W. Sloss  ct31244
Zachary A. Rynar _(application pending)_
One Landmark Sq., 15th Fl.
Stamford, CT 06901
Tel: (203) 325-4491
Fax: (203) 325-3769
sbloch@sgtlaw.com
isloss@sgtlaw.com
zrynar@sgtlaw.com

_Attorneys for Plaintiffs_