UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELIZABETH LITTLE, CATHY ARMSTRONG, CLAIR AWAD, KELLY BRANCH, SUZANNE FITZGERALD, MARI GUNN, SARAH HERNANDEZ, STACY VAIL, CHRISTINA VANVLIET, BILLIE BARNETTE, and ROBERT RULLO, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNILEVER UNITED STATES, INC., AEROPRES CORPORATION, and VOYANT BEAUTY, LLC, <br><br> Defendants, <br> _____ <br><br> VOYANT BEAUTY, LLC, <br><br> First Third-Party Plaintiff, <br><br> v. <br><br> DIVERSIFIED CPC INTERNATIONAL, INC., <br><br> First Third-Party Defendant, <br> _____ <br><br> AEROPRES CORPORATION, <br><br> Second Third-Party Plaintiff, <br> v. <br> BP ENERGY COMPANY and AUX SABLE LIQUID PRODUCTS LP, <br><br> Second Third-Party Defendants. <br> _____ | Case No. 3:22-CV-01189 (MPS) <br><br> JULY 15, 2024 |

## THIRD-PARTY COMPLAINT

Pursuant to Rule 14 of the Federal Rules of Civil Procedure, defendant/second-third-party plaintiff Aeropres Corporation ("Aeropres" or "Defendant/Second Third-Party Plaintiff"), brings this Third-Party Complaint against BP Energy Company ("BP") and Aux Sable Liquid Products LP ("Aux") and alleges as follows:

## THE PARTIES

1. Defendant/Second Third-Party Plaintiff Aeropres is a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business at 1324 North Hearne Avenue, Suite 200, Shreveport, Louisiana 71137.

2. Second Third-Defendant BP is a corporation existing under the laws of the state of Delaware with its principal place of business at 501 Westlake Park Boulevard, Houston, Texas, 77079.

3. Second Third-Party Defendant Aux is an entity existing under the laws of the state of Delaware with its principal place of business at Energy Ctr 5, 915 N. Eldridge Pkwy Ste 1100, Houston, TX 77079.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over BP and Aux under 28 U.S.C. §1332 and 28 U.S.C. §1367.

5. This Court has personal jurisdiction over BP and Aux pursuant to C.G.S. § 33-929.

6. This Court also has personal jurisdiction over BP because it has continuous and systematic contacts with the State of Connecticut, including through its interest in numerous BP gas stations throughout the State of Connecticut.

7. This Court has personal jurisdiction over BP because it solicits business in the State of

Connecticut.

8. This Court also has personal jurisdiction over Aux and BP based on their respective roles in the manufacturing, marketing, labeling, distribution and sale of the dry shampoo products at issue in the underlying Amended Consolidated Complaint ("ACC") *See,* Docket 101.

9. This Court has personal jurisdiction over BP and Aux because they sold and/or distributed components of Products that were reasonably expected to be consumed within the State of Connecticut and as alleged in the ACC were purportedly consumed by at least one plaintiff, Elizabeth Little, within the State of Connecticut.

10. This Court has personal jurisdiction over BP and Aux because the claims herein arise out of an alleged injury to plaintiff, Elizabeth Little, a Connecticut resident, who asserts tortious conduct arising from the consumption of a BP and Aux product within the State of Connecticut.

11. This Court also has personal jurisdiction over BP and Aux because they transacted business within the State of Connecticut when they availed themselves of the consumer marketplace in this District based on their respective roles as suppliers and are therefore subject to jurisdiction.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (b)(1) and 28 U.S.C. 1391 (b)(2) and pursuant to the doctrine of ancillary venue.

## NATURE OF THE ACTION

13. This action was commenced by the Plaintiffs on September 9, 2022, and arises out of allegations that dry shampoo Products purchased by Plaintiffs contained trace amounts of benzene. The Plaintiffs amended their complaint on January 29, 2024, to assert claims against Aeropres and co-defendant Voyant. See Am. Consol. Class Action Compl. ("ACC") [Dkt. 101].

14. By way of background, Unilever purchased the finished Products from co-defendant

Voyant Beauty, LLC ("Voyant").

15. In the ACC, Plaintiffs allege a myriad of claims against each direct defendant purportedly arising from "the presence of benzene rendering the products unsafe" ("the Products"). *See,* Docket 101 at 17.

16. Specifically, Aeropres supplied, through Voyant, co-defendant Unilever United States, Inc. ("Unilever") with propellant for use in the Products, which, as alleged in the ACC, purportedly contained benzene. Aeropres purchased its propellant from BP, a marketer of the feedstock alleged at issue. BP directed the delivery of the contracted feedstock to be shipped directly from Aux to Aeropres during the year at issue; 2021. Aeropres received purported contaminated feedstock (the "Feedstock') and then purportedly supplied it to Voyant, who incorporated it into the Products for Unilever.

17. Voyant makes the Products at its Elkhart, Indiana facility.

18. Since January of 2018, Voyant has used six different propellants in the Products.

19. Each Product contains at least one propellant and some of the Products contain a blend of more than one propellant.

20. Voyant sourced the six propellants used in the Products both from Aeropres and from First Third-Party Defendant Diversified CPC International, Inc ("Diversified").

21. The Products sourced each have a different formula, consisting of a different combination of chemical ingredients.

22. None of the formulas include benzene as an intentionally added ingredient. Voyant makes the Products to conform to the formulas. Thus, there was no intent to put benzene in the Products.

4

IMANAGE\118\0218\41461527.v1-7/15/24

23. Aeropres supplies Voyant with five propellants that Voyant has used in the Products since January 2018.

24. Each of these propellants has a unique chemical composition with varying components.

25. From January 1, 2018 to December 2, 2021, Aeropres supplied propellants to Voyant from two facilities, one located in Manhattan, Illinois (74% of shipments), and the other located in Morris, Illinois (26% of shipments).

26. Aeropres in turn sourced its gas supply for these propellants, which is also called "feedstock," from different companies with operations located in or near natural gas fields.

27. In July 2017, Aeropres contracted for the delivery of gas including isobutane, butane, and propane from BP pursuant to the terms and conditions of a Master Agreement for Purchase, Sale or Exchange of Liquid Hydrocarbons the Products. BP contracted with Aux for the purchase and delivery of merchantable gas feedstocks to be delivered to Aeropres during the year 2021. *See*, Exhibit A, the "Master Agreement."

28. BP is a marketer of the gas feedstock at issue that Plaintiffs allege may have contained benzene, and upon information and belief, does not produce or manufacture any gas feedstock.

29. BP coordinated the delivery of gas feedstock to be shipped directly from Aux to Aeropres during the year 2021.

30. As part of the Agreement, the Bills of Lading establish that Aux made at least two deliveries directly to Aeropres on June 21, 2021 and June 23, 2021, and included a product certification for butane dated June 21, 2021. *See*, Exhibit B, Bills of Lading and Certification from Aux.

31. BP invoiced Aeropres for these deliveries that were shipped directly from Aux to Aeropres on August 31, 2021, in the amount of $33,532.66. See Exhibit B.

32. Based on the above, Aeropres, BP and Aux were in privity of contract.

33. Aeropres performed all of its obligations and conditions under the Agreements.

34. Pursuant to Section 8.5 (i) of the Master Agreement, BP:

> … SHALL HAVE RESPONSIBILITY FOR AND ASSUME ANY LIABILITY WITH RESPECT TO THE PRODUCT PRIOR TO ITS DELIVERY TO BUYER AT THE DELIVERY LOCATION(S). SELLER.
>
> SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD BUYER AND ITS AFFILIATES, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES AND AGENTS, HARMLESS FROM ANY AND ALL CLAIMS OR LIABILITY ARISING FROM OR ON ACCOUNT OF CLAIMS OF TITLE, PERSONAL INJURY, DEATH OR PROPERTY DAMAGE (A) THAT ARISE FROM FACTS OR CIRCUMSTANCES THAT OCCUR BEFORE THE DELIVERY OF PRODUCT TO BUYER UNDER THIS CONTRACT OR (B) THAT ARISE OUT OF THE DELIVERY BY SELLER OF ANY OFF-SPEC PRODUCT TO BUYER, UNLESS THE BUYER ACCEPTS OR IS DEEMED TO HAVE ACCEPTED ANY OFF-SPEC PRODUCT.

35. The Master Agreement also specified that the quality of the BP Products was to be free from any contaminants:

> **"Section 5, 5.1 : Quality and Measurement**
>
> ….all Product delivered under this Contract shall meet the GPA specifications for that Product and contain no deleterious substances or concentrations of any contaminants that may make it or its components commercially unacceptable in generally industry application."

36. Company-wide testing in July 2021, determined that benzene was detected in the feedstock from one supplier – BP; via the deliveries made by Aux, associated solely with the Morris facility.

37. Aeropres tested the feedstock and confirmed low levels of benzene only in the

hydrocarbon products supplied by BP through Aux and delivered to the Morris facility.

38. In response to these test results showing contamination, Aeropres immediately disqualified BP and Aux as a supplier and ceased purchasing feedstock from BP and Aux in late August 2021.

39. On December 13, 2022, after several good faith attempts, Aeropres sent BP and Aux a final letter requesting that they defend and indemnify Aeropres for any and all costs and expenses associated with the alleged benzene-contaminated Products.

40. This correspondence detailed that the purported benzene contamination of the Products were traced back to the hydrocarbons sold from Aeropres' Morris Illinois facility and only in the hydrocarbon products supplied by BP and Aux. This letter also attached prior correspondence and testing results previously sent on:

    a. July 21, 2021 to BP,

    b. August 24, 2021 to Aux,

    c. October 25, 2021 to Aux. and

    d. December 7, 2021.

41. Despite these good faith efforts made by Aeropres, neither BP or Aux responded.

42. Notably, and as relevant herein, Aeropres does not manufacture or utilize benzene in any of its processes.

43. Despite BP and Aux's contractual obligations and their clear liability, BP and Aux have failed and refused to indemnify and/or reimburse Aeropres for any of its losses.

44. Notwithstanding Aeropres' request for defense and indemnity, BP and Aux have failed to bear the costs incurred by the purported benzene contamination or to compensate Aeropres for the damages it has suffered and continues to suffer.

45. Aeropres therefore brings claims for breach of contract, breach of express and implied warranties, negligence, negligent misrepresentation, strict liability, and contribution and indemnity against BP and Aux as stated below for the contamination of consumer products and all damages resulting therefrom.

## CLAIMS FOR RELIEF
## COUNT I
## Breach of Contract

46. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 45.

47. In July 2017 and thereafter, Aeropres entered into a valid and enforceable contract under which BP, and through BP, Aux, both agreed to supply Aeropres with the Products. *See*, Exhibits A and B, referred collectively herein as "the Agreements."

48. Aeropres performed all of its obligations and conditions under the Agreements.

49. BP and Aux failed to deliver the Products in accord with the quality specifications agreed upon and the certifications it provided. *See,* Exhibit B, Aux Certification.

50. The Products were contaminated with latent defects.

51. BP and Aux therefore breached the contract.

52. Aeropres suffered damages and continues to suffer damages.

## COUNT II
## Contractual Indemnity

53. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 52.

54. In July 2017, Aeropres entered into a valid and enforceable contract under which

BP agreed to supply Aeropres with the Products.

55. BP contracted with Aux for the direct delivery of the Products to be shipped to Aeropres.

56. Aeropres performed all of its obligations and conditions.

57. Under the Section 8.5 (i) of Master Agreement, BP:

> … SHALL HAVE RESPONSIBILITY FOR AND ASSUME ANY LIABILITY WITH RESPECT TO THE PRODUCT PRIOR TO ITS DELIVERY TO BUYER AT THE DELIVERY LOCATION(S). SELLER.
>
> SHALL RELEASE, DEFEND, INDEMNIFY AND HOLD BUYER AND ITS AFFILIATES, AND THEIR RESPECTIVE DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES AND AGENTS, HARMLESS FROM ANY AND ALL CLAIMS OR LIABILITY ARISING FROM OR ON ACCOUNT OF CLAIMS OF TITLE, PERSONAL INJURY, DEATH OR PROPERTY DAMAGE (A) THAT ARISE FROM FACTS OR CIRCUMSTANCES THAT OCCUR BEFORE THE DELIVERY OF PRODUCT TO BUYER UNDER THIS CONTRACT OR (B) THAT ARISE OUT OF THE DELIVERY BY SELLER OF ANY OFF-SPEC PRODUCT TO BUYER, UNLESS THE BUYER ACCEPTS OR IS DEEMED TO HAVE ACCEPTED ANY OFF-SPEC PRODUCT.

58. The Master Agreement specified the quality of the Products to be free from any contaminants:

**"Section 5, 5.1 : Quality and Measurement**

….all Product delivered under this Contract shall meet the GPA specifications for that Product and contain no deleterious substances or concentrations of any contaminants that may make it or its components commercially unacceptable in generally industry application."

59. Given that benzene is not part of the specifications for any of the Products, that latent defect existed in the Products prior to the delivery to the Morris facility.

60. Moreover, neither BP nor Aux notified Aeropres of the presence of benzene in the Products.

9

61. Accordingly, per the above provision, BP and Aux have responsibility for and assumed all liabilities with respect to any benzene-contaminated Products and must defend and indemnify Aeropres for any and all costs and expenses associated therewith.

62. Aeropres has suffered and continues to suffer losses, damages, damages and injury to property, claims, demands, causes of action, suits, and expenses resulting from and arising out of BP's supply of contaminated Feedstock.

63. BP and Aux are obligated to reimburse Aeropres for the losses, damages, damages and injury to property, lost profits, lost market share, claims, demands, causes of action, suits, and expenses, including litigation expenses, Aeropres has incurred or will in the future incur as a result of Aeropres' supply of contaminated Propellant.

## COUNT III
### Breach of Express Warranties (U.C.C. § 2-313)

64. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 63.

65. In connection with BP's supply of Propellant to Aeropres, BP made express warranties in writing upon which Aeropres relied in purchasing and using Propellant from BP that was delivered by Aux. In accord with the Master Agreement, Aux supplied a certification for the Products and Propellant delivered.to Aeropres. See, Exhibit B.

66. The Products and Feedstock failed to conform to the express warranties. As a direct and proximate result of BP's and Aux's breach of express warranties, Aeropres suffered significant damage, including but not limited to damages and injury to property, and the damages associated with ongoing litigation.

## COUNT IV
### Breach of Implied Warranty of Merchantability (U.C.C. § 2-314)

67. Aeropres re-alleges and incorporates by reference into this cause of action each and

every allegation set forth in Paragraphs 1 through 66.

68. Aeropres relied upon the Products being merchantable,

69. BP and Aux sold Products to Aeropres that were not of merchantable quality because they were contaminated with latent defects.

70. Based on the Products being contaminated with latent defects, Aeropres suffered significant damage, including but not limited to damages and injury to property, and the damages associated with ongoing litigation.

## COUNT V
**Breach of Implied Warranty of Fitness for a Particular Purpose (U.C.C. & 2-315)**

71. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 70.

72. At the time of contracting, BP and Aux had reason to know that Propellant would be used as an ingredient in products, which were intended for sale and use in humans.

73. The feedstock sold by BP and Aux was not fit for the purpose of being incorporated into products intended for human topical application.

74. Aeropres relied on BP and Aux for their skill and judgment to select suitable goods for the purpose of being incorporated into products intended for human topical application.

75. As a direct and proximate result of BP and Aux's breach of the implied warranty of fitness for a particular purpose, Aeropres suffered significant damage, including but not limited to damages and injury to property, and the damages associated with a nationwide recall to remove affected products.

## COUNT VI
### Negligence

76. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 75.

77. BP and Aux owed a duty to Aeropres to provide uncontaminated or reasonably safe Products.

78. BP and Aux breached their duty to Aeropres to provide Propellant in a condition that was not contaminated.

79. BP and Aux failed to take adequate precautions to prevent contamination of the Propellant and/or to take adequate steps to detect contamination once it occurred.

80. As a direct and proximate result of BP and Aux's breach of its duty, Aeropres suffered significant damage, including but not limited to damages and injury to property, and the damages associated with a nationwide recall to remove affected Products.

## COUNT VII
### Negligent Misrepresentation

81. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 80.

82. BP and Aux distributed and shipped the Products containing the Feedstock to Aeropres.

83. Aux and BP made a false statement of material fact to Aeropres by representing that the Products containing the Feedstock they distributed and shipped to Aeropres were not contaminated and, in particular, were not contaminated with benzene. *See*, Ex. B, Certification.

84. BP and Aux failed to take adequate precautions to prevent contamination of the

Products containing the Feedstock they distributed and shipped and/or to take adequate steps to detect contamination once it occurred. Thus, its own carelessness or negligence interfered with its ability to ascertain the truth of the statement of material fact it made to Aeropres that the feedstock gases that it was shipping to Aeropres were not contaminated and, in particular, were not contaminated with benzene.

85. At the time that BP and Aux agreed to distribute and ship the Products containing the Feedstock to Aeropres, BP and Aux had reason, or should have, to know that the Products would be used by Aeropres as an ingredient intended for sale to and use in humans. Thus, BP and Aux owed a duty to Aeropres to communicate accurate information as to whether the Products containing the Feedstock were contaminated, and, in particular, whether it was contaminated by benzene.

86. When Aeropres sold these propellant gases to Voyant, Aeropres relied upon the misrepresentations from BP and Aux that the feedstock gases they had provided were not contaminated.

87. As a direct and proximate result of BP and Aux's misrepresentations, Aeropres suffered significant damage, including but not limited to damages and injury to property, and the damages associated with a nationwide recall to remove affected products.

## COUNT VIII
### Products Liability

88. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 87.

89. BP and Aux are engaged in the business of selling the Products.

90. The Products were expected to be used without contamination or harm.

91. As a result of BP's carelessness, recklessness and negligence, by and through its agents, servants and/or, employees, in carelessly and negligently failing to properly include warnings

or otherwise notify potential consumers and/or users and/or purchasers of the known and reasonably foreseeable dangers inherent in the use of the Products.

92. That the alleged failure of the Products occurred by reason of BP's negligent, careless and reckless design, manufacture, distribution, and sale of the Products, including the negligent design of warnings and instructions, which failed to warn of dangers.

93. The Products provided to Aeropres by BP and Aux failed in that they were contaminated and caused damages.

94. As a direct and proximate result of BP and Aux's failure regarding the Products function, Aeropres suffered significant damage, including but not limited to damages and injury to property, and the damages associated with a nationwide recall to remove affected Products.

## COUNT IX
## Common Law Indemnity

95. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 94.

96. The injuries and damages claimed by the Plaintiffs, if proven, were caused by the negligence or other culpable conduct of the Second Third-Party Defendants, BP and Aux, with no fault on the part Aeropres.

97. If Aeropres is held liable to the Plaintiffs, such liability will have been determined to be vicarious and/or passive only, and imputed to BP and Aux, solely by operation of law, as a result of the direct, active negligence and other culpable conduct of the Third-Party Defendants, BP and Aux, with no active or actual fault or negligence on the part of Aeropres.

98. As a result of the foregoing, Aeropres is entitled to common-law indemnification from Second Third-Party Defendants, BP and Aux.

## COUNT X
## Common Law Contribution

99. Aeropres re-alleges and incorporates by reference into this cause of action each and every allegation set forth in Paragraphs 1 through 98.

100. If the Plaintiffs were caused to sustain the damages claimed in the manner alleged in the ACC, then such damages, if proven, were caused by the acts, negligence or other culpable conduct of the Second Third Third-Party Defendants, BP and Aux, with no fault on the part Aeropres.

102. As a result of the foregoing, to the extent that Aeropres is held liable to the Plaintiffs in an amount exceeding its equitable share of any verdict or judgment, Aeropres is entitled to contribution from the Second Third Third-Party Defendants, BP and Aux.

WHEREFORE, Aeropres requests that judgment be entered against Third-Party Defendants BP and Aux, on each Count as stated above, and that Aeropres be awarded the following relief:

A. Compensatory damages for the property damage and resulting losses caused by ' BP and Aux for their respective breaches and negligent conduct, in an amount to be determined at trial;

B. Consequential damages for the property damage and resulting losses caused by BP and Aux for their respective breaches and negligent conduct, in an amount to be determined at trial;

C. Awarding Aeropres pre-judgment and post judgment interest, and its attorney's fees, costs,

and any and all other expenses incurred in this action and

D. Any such other relief as this Court deems just and proper.


                          DEFENDANT AND SECOND THIRD-PARTY PLAINTIFF,
AEROPRES CORPORATION


By:   */s Joshua Milrad*
       Joshua L. Milrad, Esq. (ct19321)
       GOLDBERG SEGALLA LLP
       500 Enterprise Drive, Suite 402
       Rocky Hill, CT 06067
       Tel:  860-760-3328
       Email:  jmilrad@goldbergsegalla.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 15th day of July, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

By: /s Joshua Milrad
     Joshua L. Milrad, Esq.