UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ELIZABETH LITTLE, CATHY ARMSTRONG, CLAIR AWAD, KELLY BRANCH, SUZANNE FITZGERALD, MARI GUNN, SARAH HERNANDEZ, STACY VAIL, CHRISTINA VANVLIET, BILLIE BARNETTE, and ROBERT RULLO, on behalf of themselves and all others similarly situated,<br><br>   *Plaintiffs*,<br><br>   vs.<br><br>UNILEVER UNITED STATES, INC., AEROPRES CORPORATION, and VOYANT BEAUTY, LLC,<br><br>   *Defendants*. | No. 3:22-cv-01189-MPS |

**<u>RULING ON MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT</u>**

   This consolidated class action brings together cases filed across the country alleging that the defendants— Unilever United States, Inc. ("Unilever"), Aeropres Corporation ("Aeropres"), and Voyant Beauty, LLC ("Voyant")—manufactured and sold benzene-contaminated dry shampoo products. The named plaintiffs in this action—Elizabeth Little, Cathy Armstrong, Clair Awad, Kelly Branch, Suzanne Fitzgerald, Mari Gunn, Sarah Hernandez, Stacy Vail, Christina VanVliet, Billie Barnette, and Robert Rullo—now move for the Court's preliminary approval of a class action settlement agreement. ECF No. 198. While the defendants do not oppose the motion, a group of plaintiffs who originally filed suit in Florida, and whose claims have now been consolidated here, do. ECF No. 202. For the reasons below, I DENY the motion without prejudice.

1

I.      PROCEDURAL BACKGROUND

After Plaintiffs Little, Armstrong, Awad, Branch, Fitzgerald, Gunn, Hernandez, Vail, and VanVliet filed this action, ECF No. 1, I stayed the case to allow similar actions to be transferred to this Court and consolidated those cases. ECF Nos. 17, 30. Among those cases was *Simmons v. Unilever United States, Inc.*, originally filed in the Northern District of Florida. No. 3:22-cv-23376 (N.D. Fla. Nov. 17, 2022). After consolidation, the named plaintiffs, now including Barnette and Rullo, filed an amended consolidated complaint adding Aeropres—Unilever's propellant supplier—and Voyant—Unilever's manufacturer of dry shampoo products—as defendants. *See* ECF No. 101; ECF No. 187 (operative complaint). Unilever moved to dismiss the complaint, ECF No. 125, and Aeropres and Voyant joined the motion. ECF Nos. 129, 132. Aeropres and Voyant also filed their own motions to dismiss. ECF Nos. 130, 133. Among other grounds for dismissal, these motions argued that the plaintiffs lacked Article III standing.

After the motions to dismiss were fully briefed, the parties issued a joint notice informing the Court that they had "reached an agreement in principle to settle Plaintiffs' claims against Defendants in this action." ECF No. 191 at 2. In light of this notice, I denied all pending motions, including the motions to dismiss, without prejudice. ECF No. 192. The named plaintiffs then filed a motion seeking the Court's preliminary approval of a proposed class action settlement, which they characterized as unopposed. ECF No. 198.  The *Simmons* Plaintiffs, however, opposed the motion. ECF No. 202. While primarily concerned with the settlement agreement's failure to include the *Simmons* Plaintiffs as "named Class representatives," *id.* at 3, their opposition brief also raised the issue of standing. Specifically, the memorandum stated:

> [T]hough Plaintiffs do not contend that the Court lacks subject matter jurisdiction to hear the case, it must be noted that the defendants have challenged the Court's

> jurisdiction. Here, regrettably, nothing in the Motion or Proposed Order submitted with it purports to address—much less assure the Court—of the named Plaintiffs' standing to seek the relief requested . . . Accordingly, this Court should *sua sponte* consider the issue of Article III standing.

*Id.* at 4. After reviewing the motion for preliminary approval and the associated papers, I entered an order to show cause, expressing uncertainty as to whether either the plaintiffs or the settlement class had standing and inviting further briefing on the issue. ECF No. 208. Specifically, I asked the parties to address: "(1) Why at least one named plaintiff does not have standing; [and] (2) Whether the class has been defined in such a way as to include plaintiffs that lack standing." *Id.* Unilever and the named plaintiffs submitted briefs, ECF Nos. 209, 210, with Voyant joining Unilever's brief. ECF No. 211. The *Simmons* Plaintiffs did not file a brief.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 23(e) states that "claims, issues, or defenses of a certified class—or a class proposed to be certified for the purposes of settlement—may be settled . . . only with the court's approval." FED. R. CIV. P. 23(e). Rule 23(e) also sets forth a variety of factors that make a class settlement "fair, reasonable, and adequate," *id.* at 23(e)(2), and I may preliminarily approve a settlement only if I determine both that those factors are present and that the class, as defined, is "certifiable" under Rule 23. *See* FED. R. CIV. P. 23(e)(1)(B). Moreover, Article III of the Constitution requires that at least one named plaintiff have standing to bring claims on behalf of the putative class, *Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011) ("[A] class action cannot be sustained without a named plaintiff who has standing."), and that the class itself must "be defined in such a way that anyone within it would have standing." *Denny v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006).

3

Below, I assume familiarity with the complaint's factual allegations, as well as any facts contained in the record.[1]

## III.  DISCUSSION

After reviewing the arguments raised in the parties' supplemental briefs, I find that the settlement class, as defined, would include class members who lack standing. I therefore deny the motion for preliminary approval without prejudice on that basis and decline to address the *Simmons* Plaintiffs' argument related to their exclusion as class representatives.

A federal court's jurisdiction is limited to "cases" and "controversies." *See* U.S. CONST. art. III, § 2, cl. 1. "To establish an Art. III case or controversy, a litigant must first clearly demonstrate that he has suffered an 'injury in fact.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). An injury-in-fact is one that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013). "Overpaying for a product results in a financial loss constituting a particularized and concrete injury in fact." *John v. Whole Foods Market Group, Inc.*, 858 F.3d 732, 736 (2d Cir. 2017). This theory of injury—commonly referred to as the "price premium" theory—applies when a buyer purchases a product that is contaminated or carries a risk of contamination without the buyer's knowledge. *See, e.g.*, *In re Hain Celestial Heavy Metals Baby Food Litig.*, No. 21-cv-00678, 2024 WL 5239510, at *8 (E.D.N.Y. Dec. 27, 2024) ("Plaintiffs have adequately pled a 'price premium' theory. They assert that if they knew the information set forth in the Amended Complaint about the elevated levels of heavy metals in

---

[1] Unilever and Voyant appear to contest the Court's subject matter jurisdiction on facial, rather than factual, grounds. *See, e.g.*, ECF No. 209 at 2 ("[A] closer examination of [Barnette's] allegations demonstrates that under controlling Second Circuit precedent Barnette has not plausibly alleged injury-in-fact."). Nevertheless, because the Court's jurisdiction is in question, examining evidence outside of the pleadings is appropriate. *See Cargill Intern. S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1019 (2d Cir. 1993) ("In resolving the jurisdictional dispute, the district court must review the pleadings, and any evidence before it, such as affidavits.").

[the defendant]'s baby food products, they would have paid less for those products or not purchased them at all.").

Unilever and Voyant argue that the complaint's allegations "do not plausibly establish Article III standing for any named plaintiff, and the proposed class definition includes persons who have no injury-in-fact and therefore lack Article III standing." ECF No. 209 at 2. The named plaintiffs argue that at least one of them has Article III standing and that "the Class has been defined to include only purchasers of dry shampoo products that a consumer would not have purchased in light of the contamination (or risk of contamination), and therefore, who have suffered economic injury for standing purposes." ECF No. 210 at 1-2. I agree with the named plaintiffs that at least one of them has standing, but I disagree that the class, as defined, includes only those who have suffered an Article III injury.

A.  **Named Plaintiff Standing**

The named plaintiffs allege economic injury under the price premium theory. Specifically, "they believed the Unilever Dry Shampoo Products had been manufactured using acceptable standards and practices" and they allege they "would have paid less for the [products] if they had known of the presence of benzene rendering them unsafe . . . ." ECF No. 187 ¶ 8. They do not allege, however, that the particular Unilever dry shampoo products they purchased were themselves tested for the presence of benzene. Instead, their claims rely on third-party testing, which detected the presence of benzene in particular Unilever product lines. *Id.* ¶¶ 95-102. When a plaintiff predicates her injury on the purchase of a product found to be defective by third-party testing, courts in the Second Circuit apply the standing analysis set forth in *John v. Whole Foods Market Group, Inc.*, 858 F.3d 732 (2d Cir. 2017).

In *John*, the plaintiff alleged that "Whole Foods routinely inflated the weight listed on the labels of pre-packaged products, and, as a result of the mislabeling, overcharged unwitting customers for pre-packaged food." *Id.* at 734. The plaintiff did not identify "a specific food purchase as to which Whole Foods overcharged [him]," but attached to his complaint a press release regarding an investigation by the New York City Department of Consumer Affairs into "systemic overcharging for pre-packaged foods at Whole Foods" stores. *Id.* The Department had tested "80 different types of pre-packaged products and found all of the products had packages with mislabeled weights," and "89 percent . . . did not meet the federal standard for the maximum amount that an individual package can deviate from the actual weight." *Id.* The investigation took place from "fall 2014 to winter 2015," and examined all eight of the Whole Foods stores in New York City at that time. *Id.* at 735. The plaintiff alleged that, during this time period, he "made monthly purchases of [pre-packaged] cheese and cupcakes"—two of the products included in the investigation—at two of these stores. *Id.*

The Second Circuit concluded that the plaintiff had "plausibly alleged that he suffered an injury in fact by pleading both the frequency of his purchases and the systematic overcharging of pre-packaged foods at the Whole Foods stores he patronized." *Id.* at 738. The Circuit explained that, "[t]aking these allegations as true and drawing all reasonable inferences in his favor, it [wa]s plausible that [the plaintiff] overpaid for at least one product." *Id*. at 737. This was sufficient to satisfy "the low threshold required to plead injury in fact."[2] *Id.* at 737-38 (internal quotation marks omitted).

---

[2] As Unilever and Voyant note, ECF No. 209 at 3, since *John*, courts in this Circuit—primarily those in the Southern District of New York—have "identified certain factors as relevant to determine when a third party's analysis can reasonably be extrapolated to the plaintiff's individual purchase," including: 1) "whether the consumer bought the product from the same store where a defective product was found"; 2) "whether the consumer purchased the product

6

1. *Plaintiff Barnette*

Under *John*, Plaintiff Barnette has sufficiently alleged standing insofar as she has alleged that she regularly purchased a dry shampoo product confirmed by third-party testing to be consistently or systematically contaminated during the time of the alleged purchase. Specifically, Barnette alleges that she "regularly purchased and used Unilever Dry Shampoo Products including Dove Dry Shampoo and Fullness (lot code 03130KK79) during the past 15 years at Target and Walmart locations; and, specifically, purchased these Products in or about February 2022 at Target in Yulee, Florida and in or about June 2[0]21 at Walmart in Kingsport, Tennessee." ECF No. 187 ¶ 19. Both the Valisure and Impact Analytical testing detected the presence of benzene in batches of Dove Care Between Washes Volume & Fullness dry shampoo.[3] *Id.* ¶¶ 96-99; ECF No. 126-1 (additional excerpts of the Impact Analytical test results); *cf. Clinger v. Edgewell Personal Care Brands, LLC*, No. 3:21-cv-1040, 2023 WL 2477499, at *4 (D. Conn. Mar. 13, 2023) ("[E]ven in the absence of linkage to a particular batch or lot, it is reasonable to assume that the same product line would involve the same manufacturing process and with the same likelihood of residual benzene contamination even if not every batch is contaminated."). Moreover, many of these batches were either tested or manufactured around the time of Barnette's alleged June 2021 and

---

with significant regularity"; 3) "the total sample size of products tested"; 4) "what percentage of that sample size was demonstrably contaminated"; and 5) "whether the product tested was the same product that Plaintiffs bought." *Esquibel v. Colgate-Palmolive Co.*, 23-cv-742, 2025 WL 1785865 at *4 (S.D.N.Y. June 27, 2025). Standing analysis, however, is a flexible, fact-specific inquiry, and the import of the above factors can vary considerably from case to case. Moreover, these factors simply restate the particular facts the *John* Court found salient in its standing analysis—facts that I have already considered in the above analysis.

[3] Defendants elsewhere concede that the product Plaintiff Barnette alleges to have purchased—"Dove Dry Shampoo and Fullness"—is the same as the "Dove Care Between Washes Volume & Fullness" that was included in the Valisure and Impact Analytical testing. ECF No. 157 at 10 n.1 ("The only product Barnette used for which she identified the time period is Dove Care Between Washes Volume and Fullness. Valisure and Impact Analytical collectively tested 13 samples of this product from 12 different lots….").

February 2022 purchases. *See* ECF No. 187 ¶¶ 95, 97 (alleging that in "January through May 2022 . . . Valisure tested certain Unilever Dry Shampoo Products," including Dove Care Between Washes Volume & Fullness, which tested positive for benzene); *id.* ¶ 99(f) (alleging that Impact Analytical testing confirmed the presence of benzene in a batch of Dove Care Between Washes Volume & Fullness produced on May 5, 2021); ECF No. 126-1 at 3 (Impact Analytical test results showing the presence of benzene in batches of Dove Care Between Washes Volume & Fullness produced on May 5, 2021, June 17, 2021, August 25, 2021, September 16, 2021, and January 20, 2022).

Both the Valisure and Impact Analytical testing suggest that the benzene contamination was "systematic" and "routine." The benzene-contaminated batch of Dove Care Between Washes Volume & Fullness was allegedly one among nearly 70% of unique batches of Unilever dry shampoo products Valisure found to contain detectable levels of benzene. ECF No. 187 ¶ 96. Furthermore, the Impact Analytical testing suggests that Valisure's positive finding was not a one-off. *Cf. Lurenz v. Coco-Cola Company*, No. 22-cv-10941, 2024 WL 2943834, at *3 (S.D.N.Y. June 10, 2024) ("Plaintiff's sparse factual allegations make it equally plausible that the single test result was a false positive . . . or was the result of an isolated incident of contamination.") (ellipses in original) (internal quotations omitted). Of the 12 batches of Volume & Fullness dry shampoo Impact Analytical tested, *all* contained some level of benzene.[4] ECF No. 126-1 at 3. It is therefore

---

[4] There is nothing in the Impact Analytical testing results, or elsewhere in the record, to suggest that batches found to contain no benzene were excluded from the results table. Furthermore, while six of the batches contained levels of benzene that fell below the 0.18 ppm "Limit of Quantification" used in the Valisure testing, ECF No. 187 ¶ 96, I cannot infer—without more information—that Impact Analytical had the same limit of quantification. I therefore have no reason to cast doubt on the sub-0.18 ppm results in the Impact Analytical dataset.


not just possible, but plausible, because Barnette regularly purchased this product, including in June 2021 and February 2022, she purchased some that contained some amount of benzene.

In their brief, Unilever and Voyant contest Barnette's standing on three grounds. First, they deny the systematic import of the Valisure and Impact Analytical testing data. ECF No. 209 at 5 ("[T]he record does not establish that Dove V&F was 'systematically' and 'routinely' contaminated during a time Barnette was frequently buying the product."). They argue that "only four of 13 Dove V&F samples tested contained benzene above 1 part per million ('ppm'), which has become the industry standard since the contamination arose in 2021, and which is the standard plaintiffs have implicitly accepted for purposes of this settlement." *Id.* at 4 (internal citations omitted). They also note that the FDA has recently shifted "from focusing on the benzene content of the product, to the level of benzene exposure for the consumer," and has acknowledged that its 2-ppm benzene limit for consumer drug products is "intended to avoid consumer exposure of more than 20 micrograms of benzene per day and assumes a daily dose of 10 grams"—which, Unilever and Voyant argue, "is much higher than the amount of dry shampoo per use." ECF No. 209 at 4 n.1. The companies cite no authority to support the contention that 1 ppm is "the industry standard." Moreover, whether Barnette has suffered an Article III injury does not depend on a contamination threshold defined by the parties for the purposes of settlement, or, for that matter, any threshold defined by "the industry" or the FDA. To the contrary, it depends on the well-pled factual allegations of the complaint, which I must accept as true and, which here include the allegation that "given that the Dry Shampoo Products are cosmetic products – not drug products with a significant therapeutic advance – the presence of benzene at any level was and it unacceptable." ECF No. 187 ¶ 48. The complaint also alleges that "Benzene is a known human

carcinogen" and that "there effectively is no safe exposure limit for benzene." ECF No. 187 ¶ 4; *see also id.* ¶ 2 n.2 (citing an FDA bulletin, which states that "Class 1 solvents such as Benzene should not be employed in the manufacture of drug substances, excipients, or drug products because of their *unacceptable toxicity* unless their use can be strongly justified in a risk-benefit assessment.") (emphasis added); *Clinger*, 2023 WL 2477499, at *5 ("I am obliged to credit plaintiff's well-pleaded allegation that benzene is not safe at any level in sunscreen products. It would be premature for me to second-guess this factual allegation or to conclude that the FDA's determination of what is a safe level of benzene is controlling and necessarily negates the plaintiff's claim of injury for the purposes of standing.")

Because, as alleged, *any* level of benzene is hazardous, under a price premium theory, a consumer has overpaid and suffered injury when the product is unknowingly contaminated with benzene, whether the contamination is big or small. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'"); *Clinger*, 2023 WL 2477499, at *6 ("[E]ven though defendants dispute whether the amount of benzene as reported in the studies was enough to make the product unsafe, it is plausible to conclude that a consumer would not wish to purchase and use a product containing a known carcinogen.").

Second, Unilever and Voyant argue that Barnette has failed to allege she purchased the product with sufficient regularity. ECF No. 209 at 4 ("Barnette also identifies only two occasions (June 2021 and February 2022) she bought Dove V&F near the time samples of Dove V&F were tested and found to contain benzene."). The companies contrast Barnette with the plaintiff in *John*, who "bought the products once or twice per month during a several-month period . . . ." *Id.* at 5

(citing *John*, 858 F.3d at 734, 736). But nowhere in *John* does the Circuit suggest that satisfying those metrics is essential. Instead, the Circuit held that the frequency of the plaintiff's purchases was, in part, sufficient for standing insofar as it "satisfie[d] the 'low threshold' required to plead [an] injury in fact." *John*, 858 F.3d at 737-38. Moreover, I am not permitted to construe Barnette's allegations so stingily. The complete allegation reads, "Plaintiff Barnette has regularly purchased and used Unilever Dry Shampoo Products including Dove Dry Shampoo and Fullness (lot code 03130KK79) during the past 15 years at Target and Walmart locations; and, specifically, purchased these Products in or about February 2022 at Target in Yulee, Florida and in or about June 2[0]21 at Walmart in Kingsport, Tennessee."[5] ECF No. 187 ¶ 19. The statement that Barnette "regularly purchased Unilever Dry Shampoo products"—including Dove Care Between Washes Volume & Fullness—"during the past 15 years at Target and Walmart locations" is sufficient to support the reasonable inference that her purchases of Volume & Fullness dry shampoo extended beyond the June 2021 and February 2022 purchases she identified by way of example. Liberally construed, the allegation suggests that Barnette routinely purchased this product.

Third, Unilever and Voyant point out that Barnette "bought her dry shampoo products in different states from where the testing laboratory obtained them." ECF No. 209 at 5. Because some courts in this Circuit have considered "whether the consumer bought the product from the same store where a defective product was found" as a factor in determining whether "a third party's

---

[5] Courts in this district have found standing on the basis of substantially similar allegations. In *Clinger v. Edgewell Personal Care Brands, LLC*, a plaintiff alleged only that she "purchased numerous Banana Boat sunscreens in Florida, including, *inter alia*, Banana Boat Protective Dry Oil Sunscreen Spray (SPF 15), which was purchased from Amazon in June 2021, as well as Banana Boat Ultra Sport (SPF 30), which was purchased in July 2020 from Target." ECF No. 89 (complaint) ¶ 129, 21-cv-1040 (JAM) (D. Conn. Apr. 18, 2022). Judge Meyer held that, under *John*, that plaintiff had plausibly alleged an injury-in-fact. *See Clinger*, 2023 WL 2477499, at *4 (D. Conn. Mar. 13, 2023).

analysis can be reasonably extrapolated to the plaintiff's individual purchase," and, therefore, whether the plaintiff has plausibly alleged an Article III injury, *Esquibel v. Colgate-Palmolive Co.*, 23-cv-742, 2025 WL 1785865, at *4 (S.D.N.Y. June 27, 2025), this fact, according to Unilever and Voyant, should weigh against Barnette in the Court's standing analysis. ECF No. 209 at 5-6.

In *John*, the Circuit found it significant that the plaintiff allegedly purchased prepackaged foods from the same stores that a third-party investigation determined were mislabeling those foods. *See John*, 858 F.3d at 738 ("For these reasons, we conclude that John has plausibly alleged that he suffered an injury in fact by pleading both the frequency of his purchases and the systematic overcharging of pre-packaged foods *at the Whole Foods stores he patronized*.") (emphasis added). That particular factor is, however, less significant here. Whereas in *John* it was reasonable to infer that the prepackaged dairy and baked goods were weighed and labeled at individual stores, in the case of Unilever's dry shampoo products, the defect allegedly arose at the factory level. *See* ECF No. 187 ¶ 39 ("[A]ccording to a report for Unilever prepared by Voyant . . . Unilever and Voyant had contemporaneously learned . . . that Aeropres' propellant used in the manufacture of Unilever's products . . . became contaminated with benzene."). There is therefore no reason to believe that the particular store where Barnette purchased her Volume and Fullness dry shampoo would be predictive of whether that purchase was contaminated with benzene. *See Clinger*, 2023 WL 2477499, at *5 ("[I]t is plausible to conclude that, if one specific batch of the same sunscreen product contains benzene, then the other batches of the very same product line are manufactured in the same manner and—notwithstanding the possibility of variability batch to batch—are likely to contain benzene."). Moreover, the record—albeit incomplete at this stage of the litigation—

12

contains no evidence that Voyant employed multiple manufacturing facilities or that different facilities sent different products to different stores. Nor do Unilever or Voyant so allege.

2. *Other Named Plaintiffs*

Though I conclude that Barnette has plausibly alleged an injury-in-fact, that conclusion does not extend to the other named plaintiffs. First, aside from Rullo—whom I discuss further below—none of these plaintiffs allege in the complaint that they purchased from a particular product line found to contain benzene. Instead, they allege only that they purchased a particular *brand*. Little, for example, alleges that "[b]etween 2019 and 2022, [she] purchased Unilever Dry Shampoo Products including Suave and Dove from stores in and around Thomaston, CT." ECF No. 187 ¶ 10; *see also id.* ¶¶ 11-18 (containing similar allegations from Plaintiffs Armstrong, Awad, Branch, Fitzgerald, Gunn, Hernandez, Vail, and VanVliet). Such allegations do not state an Article III injury, as, without more factual specificity, they do not allow me to extrapolate the Valisure and Impact Analytical test results—which were limited to particular product lines—to the plaintiffs' purchases. *See Onaka v. Shiseido Americas Corp.*, No. 21-cv-10665, 2023 WL 2663877, at *5 (S.D.N.Y. Mar. 28, 2023) ("Plaintiffs provide no facts from which the Court could extrapolate that their isolated testing should apply broadly to the Defendant's Products . . . ."). The allegations, therefore, render it only possible, and not plausible, that these plaintiffs purchased a contaminated dry shampoo. *See Clinger,* 2023 WL 2477499, at *7 ("It would be speculative—rather than plausible—to conclude that benzene was present in Banana Boat product lines for which there are no positive test results for the presence of benzene.").

In their brief, the named plaintiffs cite portions of Awad's, Branch's, and Vail's interrogatory responses, wherein the three identify the particular Unilever dry shampoo products

13

they purchased. ECF No. 210 at 11; *see also* ECF No. 139-1 at 4 (Awad's Responses) ("Plaintiff has purchased Dove Dry Shampoo Volume and Fullness, as well as Suave Dry Shampoo Hair Refresher."); *id.* at 9 (Branch's Responses) ("From 2020 to 2022, Plaintiff purchased and used Dove Beauty Go Active Dry Shampoo and Suave Professional Dry Shampoo Refresh and Revive. Plaintiff specifically has purchased Dove Beauty Go Active Dry Shampoo . . . from Target located at 3061 Wildflower Dr., Bryan, TX 77802."); *id.* at 11 (Vail's Responses) ("From 2019 to 2022, Plaintiff purchased and used Dove Dry Shampoo Volume and Fullness, Suave Professionals Dry Shampoo Refresh and Revive, TRESemmé Volumizing Dry Shampoo, and TIGI/Bed Head Dirty Secret Dry Shampoo.").

These interrogatory responses are more detailed than the complaint's allegations, but they are still vague as to how *often* these plaintiffs purchased the products. In *John*, it was the plaintiff's regular purchase of pre-packaged cheese and cupcakes, coupled with Whole Food's systematic mislabeling of these products, that rendered it plausible that the plaintiff's purchases were also mislabeled. 858 F.3d at 737 ("For present purposes, John has plausibly alleged a nontrivial economic injury sufficient to support standing: . . . Whole Foods packages of cheese and cupcakes were systematically and routinely mislabeled and overpriced, and John regularly purchased Whole Foods packages and cheese and cupcakes throughout the relevant period."). Unlike Barnette, who alleges she "regularly purchased and used Unilever Dry Shampoo Products," ECF No. 187 ¶ 19, Awad, Branch, and Vail give no indication as to how many purchases they made, with Branch and Vail providing only that they made their purchases during the relevant time period. *See* ECF No. 139-1 at 9, 11.

14

Rullo lacks standing for the same reason. Unlike the others in this group, Rullo does allege in the complaint that he purchased a particular product found by third-party testing to be contaminated. ECF No. 187 ¶ 20 ("In 2021, Plaintiff Rullo purchased Bedhead Oh Bee Hive Volumizing Dry Shampoo . . . ."). Like the others, however, he has failed to allege how often he purchased this product, stating only that he "purchased and used Unilever Dry Shampoo Products during the relevant time period." *Id.*

## B. Class Member Standing

To grant the named plaintiffs' motion for preliminary approval, I must find that I "will likely be able to . . . certify the class for the purposes of judgment on the proposal." FED. R. CIV. P. 23(e)(1)(B). "No class," however, "may be certified that contains members lacking Article III standing." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). "The class must therefore be defined in such a way that anyone within it would have standing." *Id.* The proposed settlement agreement defines the class as "all natural persons, who between January 1, 2014 and December 31, 2022, purchased in the United States any Covered Product for personal, family or household use, and not resale." ECF No. 201-1 at 9. It defines "Covered Product" as "Unilever dry shampoo products sold under the Suave, TIGI, TRESemmé, Dove, and Nexxus brands." *Id.* at 6. In my November 20, 2025 order to show cause, I noted that, upon preliminary review, the class definition "appears overbroad on two fronts." ECF No. 208. First, it appears that "the date range extends well beyond the relevant time period of contamination." *Id.* Second, the scope of "Covered Products" would "seemingly include non-contaminated varieties of dry shampoo." *Id.* Accordingly, in addition to soliciting the parties' views on the issue of named plaintiff standing, I asked that the parties' briefs also address "[w]hether the class has been defined in such a way as

15

to include plaintiffs that lack standing." *Id.* After reviewing the parties' arguments in response to this issue, I conclude that it has.

First, the "Class Period" (January 1, 2014 to December 31, 2022) is plainly too broad, at least as to the start date. The earliest date for which there is evidence in the record of contamination is January 2018. *See* ECF No. 134-1 ¶ 29 (Declaration of Jan Stevens, Global Vice President Quality & Regulatory for Voyant) ("The testing of both Valisure and Impact Analytical shows that 23 of the unique lots of Unilever Dry Shampoo(s) manufactured from January 2018 through December 2, 2021 tested above 2 PPM in at least one test."). The named plaintiffs explain that January 1, 2014 "was selected (at Defendants' request) given the allegations in the Complaint of the time period encompassed by the purchases of Certain Plaintiffs: Barnette – 15 years, Gunn – beginning in 2014 . . . ." ECF No. 210 at 13. But the class period cannot be defined by the date a particular plaintiff began purchasing a product unless there are allegations in the complaint, or evidence in the record, to suggest that the product was contaminated at that time. Here, there are no allegations or evidence to suggest that the contamination extended as far back as January 1, 2014. The settlement class, as defined, would therefore encompass plaintiffs who lack standing, insofar as it would include class members who purchased these products prior to the alleged period of benzene contamination. Perhaps in anticipation of this conclusion, the named plaintiffs state that they are "prepared to work with the Defendants to revise the settlement class period to reflect a time period of January 1, 2018 to December 31, 2022." *Id.*

Second, because "Covered Products" includes *any* dry shampoo product sold under the Suave, TIGI, TRESemmé, Dove, and Nexxus brands, its scope extends beyond the particular

16

product lines found by third-party testing to contain benzene.[6] The named plaintiffs argue that, because the contamination arose "from the use of the same propellant from the same suppliers at the same manufacturing facilities," the contamination was "systemic," and therefore "defining 'Covered Products' as all [dry shampoos] sold under the relevant Unilever brands . . . is consistent with the theory that each such product was within the scope of the contamination or risk." ECF No. 210 at 14-15. The named plaintiffs are, in other words, asking me to infer—based on product recalls, third-party testing, and an FDA "warning letter," *id.* at 14—that the contamination was so widespread as to include *all* product lines sold under the above-named brands. But that is a stretch too far under the fact-specific standing analysis *John* requires, and I am not permitted to draw such loose inferences. *See Atlantic Mut. Ins. Co. v. Balfour Maclaine Intern. Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) ("[A]rgumentative inferences favorable to the party asserting jurisdiction should not be drawn.").

Even in the context of class member standing, *John*'s analysis continues to apply. That analysis suggests that, absent direct proof of contamination, the class must be defined to include only persons who purchased from a particular product line found to be contaminated by third-party testing. *See John*, 858 F.3d at 737 ("For present purposes, John has plausibly alleged a nontrivial economic injury sufficient to support standing: according to the DCA's investigation, *Whole Foods packages of cheese and cupcakes* were systematically and routinely mislabeled and overpriced,

---

[6] Plaintiffs do not argue that the Valisure and Impact Analytical testing included all product lines under the various brand names, nor would it be reasonable to infer as much. The defendants claim "there are nearly 50 dry shampoo product lines under" the Suave, TIGI, TRESemmé, Dove, and Nexxus brands, ECF No. 209 at 8, but cite no evidence to support that claim. There is, however, evidence in the record that suggests the number of product lines exceeds those tested by the third parties. ECF No. 134-1 at 4 (Declaration of Jan Stevens, Global Vice President Quality & Regulatory for Voyant) ("Voyant has manufactured 1,275 unique lots of Unilever Dry Shampoo(s) product for 102 unique products across the [Dove, Suave, TIGI, Nexxus, TRESemmé, and Living Proof] brands.").

and John regularly *purchased Whole Foods packages of cheese and cupcakes* throughout the relevant period.") (emphasis added); *Clinger*, 2023 WL 2477499, at *4, 7 ("applying the reasoning of *John*" and finding that "it would be speculative—rather than plausible—to conclude that benzene was present in [ ] product lines for which there are no positive test results for the presence of benzene"). Otherwise, the proposed class includes persons who lack standing. *See Clinger,* 2023 WL 2477499, at *7 (denying that a subset of the plaintiffs, "who allege[d] they purchase[d] Banana Boat sunscreen products that [were] not the same as any of the product lines that have been reported by Valisure or the plaintiffs' independent testing to contain benzene," had standing).

## IV.   CONCLUSION

The named plaintiffs' motion for preliminary approval (ECF No. 198) is DENIED without prejudice. Though I find that Barnette has standing to represent a settlement class, I cannot approve the proposed class because, as defined, it is impermissibly broad. That's not to say that Barnette could not represent a narrower class defined in a manner that would allow for the Court's certification. But it's not for the Court to define the class, and I leave it to the plaintiffs' counsel to take next steps as they see fit. In light of this ruling, the plaintiffs shall file a status report no later than **March 3, 2026** that sets forth how they propose to proceed.

<div style="text-align: right;">IT IS SO ORDERED.</div>

<div style="text-align: right;">/s/<br>Michael P. Shea, U.S.D.J.</div>

Dated: Hartford, Connecticut
February 17, 2026